976 So.2d 69 (2008)
Jean MENARD, Appellant,
v.
UNIVERSITY RADIATION ONCOLOGY ASSOCIATES, LLP, Appellee.
Nos. 4D06-4901, 4D07-576.
District Court of Appeal of Florida, Fourth District.
February 13, 2008.
Rehearing Denied April 2, 2008.
*70 Edward R. Holodak, Hollywood, for appellant.
Geoffrey D. Ittleman of the Law Offices of Geoffrey D. Ittleman, P.A., Hollywood, for appellee.
FARMER, J.
In this action to recover unpaid charges for health care services, both sides took the position that the amount owed was fixed by an agreement. The trial judge sided with the health care provider's view and entered judgment accordingly. Because of a significant error in the process we reverse.
Before litigation began, the clinic's attorney wrote the patient demanding payment of an unpaid balance of $27,000. When payment was not forthcoming, the clinic filed suit claiming that $77,000 was due, instead of the $27,000 previously demanded. Answering the suit, the patient conceded liability for $27,000.
Later both sides filed motions for summary judgment. In response to the clinic's motion, the patient sought a deposition of the person at the clinic with the "most knowledge" as to the clinic's claim. The clinic designated Molina as the person with the most knowledge. At the deposition Molina testified that it was among her duties to make payment plans with patients and that she had done so with this patient.
She explained that the amount billed to an insurance payor for the planned services would have been $90,000, but the patient's health insurance did not cover the services. They agreed that the amount that patient would pay from his own funds for the same services was $40,000 "no matter what." They also agreed on a schedule for payments as treatment progressed. As the services progressed the patient paid $13,000 but failed to pay the balance.
In its summary judgment papers, the clinic identified its witness Molina as the person who made the agreement with patient on behalf of the clinic. The clinic argued, however, that the clinic notified the patient's on his final visit that, because of his failure to pay the balance, he now owed $77,000 instead of $27,000 as agreed. The clinic argued that the patient's motion for summary judgment should be denied because the patient had been informed that he owed the larger sum.
At the summary judgment hearing, both sides relied on Molina's deposition testimony, the clinic filing no affidavits. Patient filed an affidavit to support his motion. Patient swore that on three occasions before suit was filed the clinic had demanded the sum of $27,000 and had never mentioned him owing the larger sum. He swore the first time he had ever been told by the clinic that they were claiming $77,000 was with the filing of the suit. He also relied on the presuit letter demanding payment of $27,000 made by clinic's attorney. He argued that the deposition testimony of Molina  the clinic's person with the most knowledge  was that he owed only $27,000 as agreed.
He also cited the clinic's response to his motion for summary judgment. That response openly acknowledges that the clinic did not even create its "policy" demanding the full insurance amount when a patient fails to pay the agreed charge until after *71 this patient had already failed to made payment, thereby tacitly admitting that the larger sum was never actually agreed by the parties at the beginning.[1] He conceded that the clinic was entitled to a final judgment for $27,000.
The trial court denied summary judgment, and the case proceeded to trial. At trial the clinic produced  for the first time  one of its doctors to testify as to the making of the agreement. Patient immediately objected that the clinic should not be permitted to disavow either its designation of Molina as the witness having the most knowledge, or to now adduce changed testimony from that given by Molina. The clinic argued that the doctor was listed in the pretrial list of witnesses. The trial judge overruled the objection and permitted the testimony.
The doctor testified that he had direct knowledge of the agreement and that the parties had agreed at the very beginning before services were begun. He asserted that the patient had agreed to pay the full insurance amount if he failed to pay the lower charge. Ultimately the trial judge entered a final judgment holding the patient liable for the full $77,000 claimed with interest. Patient appeals.
The patient argues that this surprise change in testimony was contrary to the position that clinic had taken since the case was filed. At no time before trial, patient argues, did the clinic ever suggest the parties had actually agreed before services began that he would owe the full amount charged to an insurance payor if he failed to pay. He pointed out that Molina's testimony at the deposition was clear that the agreement was for a maximum of $40,000. Only after he had defaulted did the clinic increase its demand to the larger sum. Because the larger sum was first raised only then, it is manifest that it was not part of the original understanding and agreement.
The patient contends that the surprise change in testimony by the clinic should be treated no differently than courts treat surprise changes in expert witness testimony. He rests his case on our decisions in Department of Health and Rehabilitative Services v. J.B., 675 So.2d 241 (Fla. 4th DCA 1996), Grau v. Branham, 626 So.2d 1059 (Fla. 4th DCA 1993), and Office Depot, Inc. v. Miller, 584 So.2d 587 (Fla. 4th DCA 1991). J.B., Grau and Office Depot all stand for the proposition that it is an abuse of discretion to allow a party at trial to change, in this manner, the substance of testimony given in pretrial discovery.
In J.B. the plaintiff offered Dr. Burke as a witness on economic issues. Defendant took a pretrial deposition in which he specifically asked the witness if he was going to testify at trial about "life care plans." He responded that he had "received no instruction on that." A few days before trial, defendant moved to exclude any testimony by Dr. Burke as to life care plans, *72 but the trial court allowed him to do so if plaintiff furnished defense counsel with "the information" by the end of that day. Plaintiff did not furnish the information until just before trial began, but the court permitted the witness to testify anyway, allowing defendant to take an "updated" deposition one evening during trial. In holding that the court had abused its discretion, we relied on Binger v. King Pest Control, 401 So.2d 1310 (Fla.1981), in which the supreme court had recognized the authority of trial judges to exclude testimony on account of violations of pretrial orders. We explained:
"Although Binger dealt with the failure to disclose a witness, its principles have been applied where the presentation of a changed opinion is tantamount to permitting an undisclosed adverse witness to testify. Applying Binger's logic to the facts in this appeal, we find that the `playing field was not level' and there was, in fact, surprise resulting in prejudice to HRS. Although the court afforded HRS the opportunity to depose one of the witnesses after the first day of the trial, HRS had no opportunity to obtain information or expert opinion to rebut the testimony of the witness and thereby cure the prejudice. The permitting of such testimony caused a disruption of the orderly and efficient trial of the case." [e.s., c.o.]
675 So.2d at 244. In short, allowing parties at trial to substantially change the essential import of pretrial testimony of any kind without prior disclosure in discovery slants the field of justice to give unfair advantage to the party making such a change.
In Grau the issue also involved new and different testimony by expert witnesses, which the trial judge there thought justifiable because "update" depositions were permitted during trial. Condemning this as "ambush tactics" prejudicing the opposing party, Judge Warner wrote:
"While the trial court does have broad discretion in sorting through witness disclosure and discovery problems, there are limits, and we think one has been surpassed in this case. The trial court not only allowed the plaintiff to disobey its clear pretrial orders, but it appeared more concerned with the prejudice to the plaintiff in disallowing the testimony of these witnesses, than with the prejudice to the defendant in striking their testimony regarding the trial examinations. . . ." [c.o.]
626 So.2d at 1060. She further explained:
"Once the trial starts the lawyers are engaged in the unfolding of the evidence they have already collected. That is why there are discovery cutoffs. All the discovery rules and the extensive efforts of parties to discover the other party's case would be for naught if one side were able to wait until after the trial started to establish key pieces of evidence such as what occurred in this case. . . ." [e.s., c.o.]
626 So.2d at 1061. She elaborated that nothing in Binger permits this kind of litigation tactic:

Binger certainly does not require the trial court to admit this testimony. Binger dealt with the failure to disclose a witness, although its teachings have been applied where the presentation of a changed opinion is tantamount to permitting an undisclosed adverse witness to testify. . . . [e.s., c.o.]
In closing, she made clear:
Certainly, if prejudice can be cured efficiently, then it should. But the plaintiff takes his own risk in adopting an ambush strategy and should not profit from his own wrongdoing. . . . The wrongs of the attorney should not harm the innocent defendant who in good *73 faith engaged in discovery and conducted the trial by the rules. [e.s., c.o.]
626 So.2d at 1062. Again, we held the changes in pretrial testimony were functionally indistinguishable from failing to disclose adverse witnesses.
In Office Depot, which also involved a change of testimony by an expert witness at trial, we said:
"the spirit and purpose of Rule 1.360(b) requires the disclosure of a substantial reversal of opinion such as occurred here, if a party intends to offer that changed opinion at trial. Parties who fail to make such disclosure do so at their peril, depending on the circumstances of the particular case. In this case, allowing the presentation of the changed opinion was tantamount to permitting an undisclosed adverse witness to testify as in Binger." [e.s.]
584 So.2d at 590-91. In affirming the trial judge's exclusion of the changed testimony, Judge Anstead closed the opinion with the following warning:
"The trial court's action here sends out a strong message to those who do not adhere to the code of fair play advanced by Binger. Serious violations of the pretrial disclosure rules may result in the exclusion of important evidence, and may, in extreme circumstances, lead to the grant of a new trial." [e.s.]
584 So.2d at 591. Our warning, issued more than 15 years ago, has never been withdrawn.
Obviously the testimony permitted in this case does not involve a change in an expert's opinion. But in some respects, it is even more significant because it involves historical fact: who said what; what did the parties agree. It is conceivable that, given new information, an expert may honestly change an opinion. But historical fact is not  or should not be  mutable in that way. And while the memories of witnesses may fade or simply be indistinct on a given subject or event, the nature of the testimony in this case is not of that kind.
Here the partnership was allowed to designate for itself in pretrial discovery the person acting on its behalf with regard to this patient's agreement. At no time before trial did the clinic ever suggest that Molina had been designated in error through an honest mistake. Indeed, Molina clearly testified at her deposition that she was in fact the person who concluded the agreement on behalf of the clinic. And she repeated that testimony at trial. In pretrial papers, the clinic continued to proceed on the basis of Molina's testimony, arguing instead that it should recover the undiscounted sum because it had later informed its patient of that change.[2]
And while the opponent of expert witness opinion testimony might theoretically be able to counter with a newly obtained expert opinion of its own, that is hardly true of testimony as to historical fact unequivocally established under oath in pretrial discovery. When a party in litigation takes the position under oath by its own, competent witness that a certain historical fact directly affecting the claim in suit is true, we are simply unable to imagine how an opposing party relying in its trial preparations on that testimony of historical fact could possibly counter a surprising change in it at trial. The prejudice to the patient is both serious and undeniable.
The clinic's only real response is that it had disclosed its doctor as a witness in the list of witnesses attached to the pretrial stipulation. We note, however, that in addition *74 to Molina the clinic's witness list included the names of three doctors but did not designate the actual subject of the testimony expected from any of the doctors. Under the circumstances, it would have been a reasonable inference that the named medical personnel, the physician witnesses, would testify about the medical services performed by the clinic, should that become an issue at trial in proving up the claim.
In Office Depot, we made clear that "the spirit and purpose of rule 1.360(b) requires the disclosure of a substantial reversal of opinion . . . if a party intends to offer that changed opinion at trial." 584 So.2d at 590. We see no reason why the requirement of pretrial disclosure for a change in testimony should be any different for historical fact witnesses. Yet nothing in the witness list even hinted at a change as to the testimony concerning the making of the agreement before services began.
The trial tactics of the clinic should not be tolerated.[3] The clinic's surprising change in testimony was "tantamount to permitting an undisclosed adverse witness to testify as in Binger." 584 So.2d at 591. The trial judge's acceptance of this change improperly tilted the field of justice in favor of the clinic. 675 So.2d at 244. The orderly use of discovery by the patient to discover the other party's case came to nothing by allowing the clinic to wait until after trial started to change the key piece of evidence as to the making of the agreement in this case. 626 So.2d at 1061. Prejudice is palpable. Discretion was abused.
Ordinarily a new trial might be indicated. In this instance, however, the admissible evidence of the clinic's own testimony demonstrably made the patient's motion for summary judgment incontestable The clinic is entitled to recover only the reduced sum of $27,000 to which it had agreed,[4] together with interest and costs. On remand, the trial judge will amend the judgment accordingly.
Two other issues remain. First, we address the trial court's determination that the homestead exemption is not available under the facts of this case. In First Leasing and Funding of Florida, Inc. v. Fiedler, 591 So.2d 1152 (Fla. 2d DCA 1992), a creditor sought to levy execution on a single-level triplex owned by the judgment debtor, consisting of debtor's residence and two other units under lease to different occupants. The trial court held that the entire triplex was covered by the homestead exemption, and the creditor appealed. The Second District noted the text of the current constitutional provision:

*75 "There shall be exempt from forced sale under process of any court . . . a homestead . . . if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or the owner's family. . . . "
Art. X, § 4(a)(1), Fla. Const. (1968). This differed from the text under the former Constitution of 1885 which provided that the exemption covered the "residence and business house of the owner." [e.s.] 591 So.2d at 1153. The court noted that in Smith v. Guckenheimer, 42 Fla. 1, 27 So. 900 (1900), the supreme court held that the exemption of a homestead in an incorporated city does not extend to improvements other than the residence or business house of the owner, nor to the land on which they are situated, though such improvements be inseparably attached to or form parts of an indivisible building, which constitutes the residence and business house of the owner. 591 So.2d at 1153. The court also relied on Bankruptcy Court decisions in Florida applying the exemption only to the part occupied by the debtor but denying it to parts used to produce income. See e.g. In re Radtke, 344 B.R. 690, 693 (Bankry.S.D.Fla.2006) (debtors who rented out portion of property as sites for mobile homes and recreational vehicles were not entitled to Florida homestead exemption for the entire 2.3 acre tract on which their home was located); In re Nofsinger, 221 B.R. 1018 (Bankry.S.D.Fla.1998) (portion used as rental not exempt); In re Aliotta, 68 B.R. 281 (Bankry.M.D.Fla.1986) (where debtor occupied one unit of a fourplex, the homestead exemption should not extend to the entire property).
We follow these holdings. Only that part of debtor's property used as his residence is exempt from levy and execution. That part leased to other occupants is not exempt. On remand the trial court shall determine whether under local law the entire property may be partitioned or in some other way divided legally (e.g., submitted to condominium ownership). If it cannot be so divided legally, then the entire parcel may be sold at public sale and only debtor's pro rata share will be exempt.
Second, we also affirm the denial of fees under the offer of settlement. Rivera v. Publix Super Markets, Inc., 929 So.2d 1184 (Fla. 4th DCA 2006) (holding that offer of judgment must state all non-monetary conditions). This case is remanded for judgment accordingly.
WARNER and GROSS, JJ., concur.
NOTES
[1] The papers stated that at the final meeting between the parties in regard to the default in payment:

"[Molina] communicated to [patient] that if he did not pay the balance due and owing in accordance with the Reduced Rate Offer, that [clinic] would deem that [patient] rejected such Reduced Rate Offer and, thus, demand that [patient] pay the full, non-discounted amount due and owing, all in accordance with the office policy that [clinic] WAS FORCED TO CREATE to deal with the fact that [patient] was the ONLY patient of [clinic] that attempted to avoid making payments. . . ." [e.s.]
Patient's argument to the trial judge focused on the emphasized part of the above quoted passage to assert that this policy of demanding the full insurance amount was decided only after patient had stopped making periodic payments.
[2] Of course, it is beyond legal dispute that in law a party to an agreement will not be heard to make unilateral, prejudicial changes in agreements previously made.
[3] We limit our holding to the facts and circumstances of this case. In particular we stress that our decision would not necessarily apply, for example, to a bona fide change by a fact witness as to past memory  perhaps having one's memory honestly refreshed  or to a real gap in memory later filled by spontaneous recollection, or the like. In this case, where the clinic itself identified Molina as the partnership witness with the significant knowledge of the making of the agreement, none of these apply. Under the circumstances here, our holding is in the nature of an estoppel, which in fact is the real principle underlying the holdings in J.B., Grau and Office Depot.
[4] Because the lower sum of $40,000 for the same services was reached in arms length negotiation by competent parties, each with a strong contrary interest as to the amount to be charged, generally it would seem that the sum they agreed upon would be deemed in law as presumptively a fair and reasonable sum for the health care services in question. Yet the record does not divulge any justification for the clinic to charge an insurance payor more than this presumptively reasonable sum it would charge a patient without insurance for the same services. We do not wish to be understood here as expressing an opinion on the propriety of such a charge.