994 So.2d 394 (2008)
J.S.L. CONSTRUCTION COMPANY, a Florida corporation, and Martin L. Espinosa, individually, Appellants,
v.
Eliyahu LEVY and Ramona Levy, Appellees.
No. 3D07-2831.
District Court of Appeal of Florida, Third District.
October 22, 2008.
*395 Pepe & Nemire and Thomas F. Pepe, Coral Gables, for appellants.
Atkinson, Diner, Stone, Mankuta & Ploucha, Margaret Z. Villella, and David B. Mankuta, Ft. Lauderdale, for appellees.
Before RAMIREZ, WELLS, and SALTER, JJ.
WELLS, Judge.
J.S.L. Construction Company and its president, Martin L. Espinosa, (collectively J.S.L.), appeal from a final judgment discharging its Chapter 713 claim of lien; awarding damages of $50,974 to homeowners Eliyahu and Ramona Levy for J.S.L.'s purported breaches of warranty, and awarding J.S.L. $50,714 on its breach of contract claim against the Levys. We agree with J.S.L. on what amounts to the company's two most significant claims, and on that basis, reverse in part the order under review.
In December of 1996, J.S.L. entered into a written contract with the Levys pursuant to which J.S.L. was to construct the "shell" of a residence for $360,000, an amount later revised to $460,000. By agreement, non-shell work was to be performed by change orders for which J.S.L. was to be paid on a materials plus 5% overhead and profit basis. The contract also authorized the Levys to contract directly for work on the home and to make direct payments to subcontractors for work performed.
Under the terms of the parties' agreement, J.S.L., among other things, was to receive $50,000 when the shell was completed. But by the time construction of the shell neared completion, it became apparent that the parties were not going to agree as to their remaining responsibilities, in significant part because of the Levys' *396 direct payments to subcontractors.[1] Despite these disagreements, on March 5, 1999, J.S.L. obtained a temporary certificate of occupancy so that the Levys could move into the home. However, J.S.L. continued to work on the home until May after which a final inspection was performed.
On July 8, 1999, J.S.L. recorded a claim of lien. In recognition of the Levys' entitlement to a credit for direct payments to subcontractors, J.S.L. noted in the lien that "there remains unpaid $184,839.00 minus that portion paid by Mr. and Mrs. Levy directly to subcontractors, the amount of which is unknown."[2] On August 18, 1999, the Levys filed a single count complaint to discharge J.S.L.'s lien claiming only that the amount claimed in the lien was "willfully exaggerated." J.S.L. counterclaimed seeking foreclosure of the lien and damages for breach of contract.
On July 13, 2000, the Levys amended their complaint to discharge J.S.L.'s lien to add claims for breach of contract and warranty; personal injury to their child;[3] slander of title; fraud; and negligence.[4] The gist of several of these new claims was that J.S.L. had not completed all of the contracted work in a workmanlike manner and that the Levys were entitled to set offs against the amount claimed due to cure defects in J.S.L.'s work.
In October of 2005, after literally years of continuances, this matter was finally set for trial. The uniform pretrial order issued by the trial court required the parties to file exhibit and witness lists, and instructed the parties that where experts were concerned, the parties were to provide all the information required by Florida Rule of Civil Procedure 1.280(b)(4)(A). See Fla. R. Civ. P. 1.280(b)(4)(A) (stating in part that "a party may require any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion"). The order also warned that exhibits not listed on a party's exhibit list would not be admitted at trial and failure to comply with the expert witness disclosure would result in preclusion of expert testimony.
On January 5, 2006, some six plus years after construction of the Levys' home was completed and after two major hurricanes[5] had hit the area, the Levys sent statutory notice to J.S.L. expressing their intent to make a claim that lightweight concrete was missing from the roof of their home. See § 558.004, Fla. Stat. (2006).[6] *397 The Levys also advised J.S.L. that their investigation was continuing:
Mr. and Mrs. Levy are in the process of having the roof replaced on their home. The plan for the original roof as constructed by your client called for a lightweight concrete pour over the solid concrete. In the process of removing the old roof, it has just been discovered that the lightweight concrete was not provided.
Needless to say, this is a latent defect which could not have been discovered but for the removal of the JSL installed roof.
In accordance with F.S. 558.004, we are providing notice of this claim. The information, as set forth above, is the only information we have at this time. As our investigation continues, we will provide additional information as received....
This notice did not indicate that the roof had to be or was being replaced because of missing lightweight concrete or that there was any other shortcoming in J.S.L.'s work.
On February 28, 2006, less than two weeks before the scheduled trial week, the Levys filed a supplemental witness list naming Jon Watkins of Millenium Makeover, Inc. as a witness. This witness list was not only untimely but also failed to designate Watkins as an expert. It also did not indicate the nature of his testimony or otherwise comply with Rule 1.280(b)(4)(A).
On March 6, 2006, the first day of trial, the Levys sought leave to amend their complaint to add a claim for defects purportedly stemming from improper installation of a roof top railing. While J.S.L. anticipated an amendment based on the statutory notice it received regarding the missing lightweight concrete, it did not expect a claim about either additional defects or about replacement of the Levys' roof. Amendment was denied. Although amendment had been denied and the Levys had failed to comply with the court's pre-trial order regarding exhibit and witness lists, Jon Watkins, a witness listed for the first time on the Levys' late-filed supplemental witness list, was allowed to testifyover objectionthat in addition to the fact that lightweight concrete called for in the architectural plans had not been installed, the roof top railings at the Levy home had not been properly installed. The Levys were also allowed to introduce a document provided by Watkins showing the cost to replace the roof as $42,387.
At the close of all evidence, the trial court found that J.S.L. had breached an implied warranty that the home would be fit for its intended purpose and awarded $50,947 in damages to the Levys on this claim, $42,387 of which represented the cost of replacing the roof. The court also found that although J.S.L.'s lien was unenforceable on statutory grounds, it was entitled to recover $50,714 from the Levys which according to the trial court was the difference between the $184,839 balance J.S.L. claimed was due under the contract and certain amounts paid directly by the Levys to subcontractors.[7]
J.S.L. claims that the court below erred in each of these determinations. We agree with two of these contentions.

Discharge of J.S.L.'s Lien
We agree with J.S.L. that the court below erred in concluding that J.S.L.'s lien had to be discharged because it was untimely filed and because the statement of account provided by J.S.L. was not properly sworn. We do so for a number of reasons, the first of which is that the Levys *398 never in the six plus year history of this case sought to discharge this lien on these grounds. To the contrary, the Levys' discharge claim was predicated solely on the allegation that the amount stated as due in J.S.L.'s lien was "willfully exaggerated."
Second, the lien was timely. Section 713.08(5) of the Florida Statutes provides that a "claim of lien may be recorded at any time during the progress of the work or thereafter but not later than 90 days after the final furnishing of the labor or services or materials by the lienor." The claim of lien in this case was filed on July 8, 1999. The evidence adduced below was that on April 19, 1999, J.S.L. called for electrical work at the Levy home. This work was performed in May 1999. Under the J.S.L./Levy contract, J.S.L. was required to oversee this, and indeed all, subcontract work. Moreover, because all subcontractor permits were by contract tied to J.S.L.'s master permit, J.S.L. could not close out its permit and complete the project until this electrical and all other subcontract work had been performed. This did not happen until May 1999, after which J.S.L. did a final walk through with the building inspector. Since J.S.L.'s claim of lien was filed within ninety days of all of these activities, it was timely. See Aronson v. Keating, 386 So.2d 822, 823 (Fla. 4th DCA 1980) ("The test to be applied is whether the work was done in good faith, within a reasonable time, in pursuance of the terms of the contract, and whether it was necessary to a `finished job.'"). It was, therefore, error to discharge J.S.L.'s lien on this ground.
Third, J.S.L. was not obligated to provide a statement of account under oath. The obligation to provide a statement under oath is triggered by a written demand by an owner which "must" be in substantially the following form:
REQUEST FOR SWORN STATEMENT OF ACCOUNT
WARNING: YOUR FAILURE TO FURNISH THE REQUESTED STATEMENT, SIGNED UNDER OATH, WITHIN 30 DAYS OR THE FURNISHING OF A FALSE STATEMENT WILL RESULT IN THE LOSS OF YOUR LIEN.
To: (Lienor's name and address)
The undersigned hereby demands a written statement under oath of his or her account showing the nature of the labor or services performed and to be performed, if any, the materials furnished, the materials to be furnished, if known, the amount paid on account to date, the amount due, and the amount to become due, if known, as of the date of the statement for the improvement of real property as (property description).
(signature and address of owner) (date of request for sworn statement of account)
§ 713.16(2), (3), Fla. Stat. (1998) (providing that an "owner may serve in writing a demand of any lienor for a written statement under oath of his or her account" and that "failure or refusal to furnish the statement within 30 days after the demand ... deprives the person ... of his or her lien").
J.S.L. argues no written demand was made. The Levys assert that they made the demand, but cite no record support for that assertion and we have found no such demand in the record. Thus, on this record we conclude no "written statement under oath" was necessary to preserve J.S.L.'s lien. The lien should not have been discharged for failure to provide a statement under oath.
Fourth, the statement provided by J.S.L. was properly sworn. Section 713.16(2) of the Florida Statutes requires, *399 on proper demand, only a statement "under oath." The statement provided by J.S.L. was signed by J.S.L.'s president who represented "[u]nder penalties of perjury, I declare that I have read the foregoing declaration including the attached Exhibit "A", [sic] containing 5 pages, and that the facts stated in these pages are true." This is an oath authorized by section 92.525 of the Florida Statutes. See § 92.525(1), (2), Fla. Stat. (1998) (providing that a document may be verified by notarized oath or affirmation or by written declaration stating "[u]nder penalties of perjury, I declare that I have read the foregoing [document] and that the facts stated in it are true"); Battle v. Gentry, 898 So.2d 263, 264 (Fla. 1st DCA 2005) (concluding that "a statement in which [a] claimant affirmed that the information contained on [a] form was true," constitutes an oath); Theoc v. State, 832 So.2d 261, 262 (Fla. 3d DCA 2002) (confirming that a statement made "under penalties of perjury" and declared to be based on facts represented as being true, is an unnotarized oath authorized by section 92.525); see also Fla. R.Crim. P. 3.987 (recognizing two types of oaths, a notarized oath signed in the presence of a notary and an "Unnotarized Oath," stating "Under penalties of perjury, I declare that I have read the foregoing motion and that the facts sated in it are true"); State v. Shearer, 628 So.2d 1102, 1102-1103 (Fla. 1993) (concluding that for purposes of defendant's 3.850 motion, "[i]n addition to a notarized oath ... section 92.525 ... provides that a signed declaration can substitute for a notarized oath if it contains the following language: `Under penalties of perjury, I declare that I have read the foregoing [document] and that the facts stated in it are true'"). This oath is all that was necessary here.[8],[9]
For these reasons, discharge of J.S.L.'s lien must be reversed.

Roof Replacement Cost
The damage award to the Levys to replace the roof on their home also must be reversed. It goes virtually without saying that the purpose of a pleading is to notify a defendant that he is being sued and what he is being sued for. See, e.g., Connolly v. Sebeco, Inc., 89 So.2d 482 (Fla. 1956). Due process demands nothing less. It is equally clear that failure to disclose the subject of witness testimony and documents that will be introduced into evidence in violation of discovery rules and court orders amounts to "trial by ambush," another way of saying a denial of due process. See Menard v. Univ. Radiation Oncology Assocs., LLP, 976 So.2d 69, 72 (Fla. 4th DCA 2008) ("Once the trial starts the lawyers are engaged in the unfolding of the evidence they have already collected. That is why there are discovery cutoffs. All the discovery rules and the extensive efforts of parties to discover the other party's case would be for naught if one side were able to wait until after the trial *400 started to establish key pieces of evidence such as what occurred in this case...." (quoting Grau v. Branham, 626 So.2d 1059, 1061 (Fla. 4th DCA 1993))); S.Z. v. Dep't of Children & Family Servs., 873 So.2d 1277, 1277 (Fla. 3d DCA 2004) (concluding that where trial counsel was not provided with a discovery packet until late in the day on Friday and the packet did not contain materials to be presented and relied upon at a Monday hearing, "this turned the hearing into a trial by ambush that violated [appellants'] due process rights").
In this case, the pleadings gave no hint that the Levys were going to seek to recover either for defects other than the missing lightweight concrete or for the cost of replacing their roof. The Levys' attempt to amend their complaint to allege such claims on the morning of trial underscores this point. The statutory notice provided to J.S.L. regarding the missing lightweight concrete also does not state that the Levys were seeking replacement of their roof as a consequence of the missing lightweight concrete or as a consequence of any other unidentified defect. Consequently, Watkins should not have been allowed to testify about defects other than the missing lightweight concrete, and his $42,387 contract for replacement of the roof should not have been admitted into evidence. See § 558.004, Fla. Stat. (2006) (prohibiting the filing of any action concerning a construction defect absent written notice of the claim at least 60 days before filing).
The testimony regarding the issue of the missing lightweight concrete certainly will not support the $42,387 roof replacement damage award. Watkins testified only that he had been hired in 2005 to replace the Levys' roof because it was leaking and that when he removed the roof tiles he discovered that no lightweight concrete had been installed as required by the original architectural plans for the Levys' home. He admitted that he had not seen any revised plans for this roof.
Unfortunately for Watkins and the Levys, the architect who drew the plans for the Levy home testified, without contradiction, that although the original plans called for installation of lightweight concrete on the Levys' roof, the Levys had redesigned the roof to accommodate a rooftop recreation area, a modification that required elimination of lightweight concrete. Thus no lightweight concrete was to be installed by J.S.L., and even if its absence was the cause for replacing the roof, responsibility for this replacement could not be laid at J.S.L.'s door.
Although there was some evidence of roof leaks early in 1999, the Levys did not contradict J.S.L.'s testimony that those minor leaks had been repaired, and the Levys offered no testimony to show that the roof had leaked at any time between the 1999 repairs and two 2005 hurricanes. There also was no evidence that problems with a rooftop railing installed by J.S.L. required replacement of the roof. In short, the claim for replacement of the roof came too late and the evidence to sustain the award was too little. There was no evidence that faulty construction by J.S.L. caused the leaks claimed in 2006, nor was there any evidence of the nature and extent of any roof warranty[10] or J.S.L.'s breaches thereof that would support the $42,387 damage award to replace the roof *401 on the Levy home. This award must, therefore, be reversed.

J.S.L.'s Counterclaim for Work Performed
J.S.L. argues that the trial court erred in limiting its recovery on its counterclaim for breach of contract to $50,714. We conclude that the evidence presented below does not support our revisiting this award.
As previously explained, J.S.L. entered into a written contract with the Levys pursuant to which J.S.L. was to construct the "shell" of the residence for $460,000. By agreement, non-shell work was to be performed by change orders for which J.S.L. was to be paid on a materials plus 5% overhead and profit basis.
Some of the change orders which followed reflected work to be done by others, however some reflected work that the parties agreed would be done by J.S.L. As to the work to be performed by J.S.L., the testimony of its president, Mr. Espinosa, reflected the company's position that notwithstanding whatever price was agreed to by the parties and written on the J.S.L. invoice, the Levys would be obligated to cover any actual cost override which was incurred. In contrast, the Levys' counsel argued if J.S.L.'s miscalculation resulted in the actual cost of certain work exceeding the agreed upon price, that was an expense to be borne by J.S.L.
This seems, in part, where the parties' disagreements as to sums due and owing developed. Without addressing the quality of the work, as the trial court made no finding as to that issue, considering any implied contract for work done outside the parties' express contract, the trial court found that on the record before it "the greater weight of the evidence adduced revealed that Defendant was paid for invoiced items." The trial judge found no unfulfilled obligation, and we cannot fault that conclusion.
Here, confronted with a number of discrepancies between the amounts claimed, amounts actually due, and amounts previously paid, J.S.L.'s president himself observed that his company's "office bookkeeping work leaves a lot to be desired." A number of J.S.L.'s invoices must be characterized as barely discernable. The testimony of the project's architect, based on figures provided by J.S.L., provides no support for J.S.L.'s claims for what amount was owed, much less what sums had already been paid.
Simply put, our review of the record fails to demonstrate error that would allow us to disturb the trial court's findings as to J.S.L.'s recovery, both in the context of its claims under an implied contract and under the express contract at issue. See N. American Islamic Trust, Inc. v. Muslim Ctr. of Miami, Inc., 771 So.2d 1227, 1229 (Fla. 3d DCA 2000) ("Findings of fact by a judge in a nonjury case will be affirmed where there is competent and substantial evidence to support those findings." (quoting Abreu v. Amaro, 534 So.2d 771, 772 (Fla. 3d DCA 1988))); see generally Sharrard v. Ligon, 892 So.2d 1092, 1094-95 (Fla. 2d DCA 2004) ("Because the parties had entered into a cost-plus contract, the amount paid by the Contractor for goods and services for the project was critical to determining the amounts owed by the Owners, both as the job progressed and at completion. See Persinger v. Estate of Tibbetts, 727 So.2d 350 (Fla. 5th DCA 1999). Therefore, accurate record keeping and accounting for costs by the Contractor was essential to the proper administration of the parties' cost-plus contract. Unfortunately, the Contractor failed to generate and maintain accurate records for his costs and expenses on the project."). Thus, we affirm the amount of $50,714, awarded on *402 J.S.L.'s counterclaim for breach of contract.

Conclusion
Accordingly, the judgment on appeal is reversed in part with instructions to reinstate J.S.L.'s lien and to vacate the $42,387 award to the Levys made to replace their roof. The award to J.S.L. of $50,714 is affirmed, with foreclosure of the lien to proceed.
Reversed in part and remanded with instructions.
NOTES
[1] By the end of the project there were some nineteen written work orders. These work orders showed the running total J.S.L. claimed was owed as well as the balance owed for each particular work order.
[2] According to J.S.L., the amount claimed in the lien did not include the value of all of the additional work that was performed from the date that the Levys were given a temporary certificate of occupancy on March 5, 1999, until the date that the project passed its final inspection on May 28, 1999.
[3] This claim was dismissed with prejudice in February 2003.
[4] This claim was voluntarily dismissed in June 2004.
[5] Hurricanes Katrina and Wilma hit the general area in 2005.
[6] This provision prohibits the filing of any action concerning a construction defect absent written notice of the claim at least 60 days before filing and requires description of the claim in sufficient detail as to inform the contractor of the general nature of each alleged construction defect and the damage or loss resulting from the defect.
[7] The slander of title claim was dismissed for lack of evidentiary support.
[8] Other portions of Chapter 713 confirm that the Legislature was well aware of the distinction between notarized oaths and unnotarized oaths. See, e.g., § 713.13, Fla. Stat. (1999); § 713.135, Fla. Stat. (1999) (same).
[9] In Stresscon v. Madiedo, 581 So.2d 158, 159 (Fla.1991), cited by the homeowners, subcontractor "Stresscon sent a timely and accurate statement of account by certified mail." However that statement was not attested to in any manner. Madiedo moved for summary judgment. Only then, did a Stresscon employee sign the statement of account and provide an affidavit swearing to its truthfulness and accuracy. Construing the pre-1994 version of section 713.16(2), the Court concluded that Stresscon's failure to comply with the requirements of section 713.16(2) were fatal to its lien claim. This distinguishes Stresscon from the facts at hand and the analysis to be applied.
[10] The Levys' architect testified that the roof as originally designed would have a life of approximately twenty years while the redesigned roof would have a life of approximately five to ten years. Thus at the time this roof was replaced it was near the end of its expected life.