[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 4, 2009
THOMAS K. KAHN
CLERK

No. 07-11342

_____

D. C. Docket Nos. 05-00165-CV-FTM-29-SPC, 05-00187-CV-FTM

2:05cv165

EQUITY LIFESTYLE PROPERTIES, INC.,

Plaintiff-Appellant,

versus

FLORIDA MOWING AND LANDSCAPE SERVICE, INC.,

Defendant-Appellee.

_____

2:05cv187

FLORIDA MOWING & LANDSCAPE SERVICE, INC.,

Plaintiff-Appellee,

versus

EQUITY LIFESTYLE PROPERTIES, INC.,
f.k.a. Manufactured Home Communities, Inc.,

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(February 4, 2009)

Before TJOFLAT, MARCUS and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

These two consolidated cases arose out of a contractual dispute between Florida Mowing and Landscape Service, Inc. ("Florida Mowing") and Equity Lifestyle Properties, Inc. ("Equity"). After the district court dismissed Equity's third amended complaint for failure to comply with a court order, the case proceeded to trial before a jury on Florida Mowing's breach of contract claim that Equity owed it $564,101.50 for work performed. The jury found for Florida Mowing in that amount, and after the district court entered judgment for Florida Mowing in both cases, Equity brought this appeal. Equity seeks alternative resolutions of its appeal. First, contending that the district court abused its discretion in dismissing its third amended complaint, Equity asks that we vacate the district court's judgment, direct the reinstatement of its third amended

complaint, and remand the case for a new trial in both cases. Second, assuming that we sustain the district court's order dismissing that complaint, Equity asks that we vacate the district court's judgment and remand the case for a new trial on the grounds that the district court erred in construing the parties' contract and abused its discretion in admitting Florida Mowing's invoices into evidence under Federal Rule of Evidence 803(6). We deny Equity's requests and accordingly affirm.

## I.

## A.

Equity owns and operates five residential manufactured home communities in Fort Myers, Florida. On August 14, 2004, after Hurricane Charley came through the Fort Myers area, Equity contracted with Florida Mowing to remove debris from these properties. The parties' agreement was drafted by Florida Mowing's manager, Julian Wright, in consultation with Equity's district manager, Barbara Stanze.[1] The agreement's cost-plus provision read as follows:

> It is also understood by both parties that the cost of this project is an unknown factor, and cannot be taken lightly, because of the state of condition that surrounds it. It is impossible to estimate a true cost, so therefore both parties agree that the contractor will bill bi-weekly and this will be a cost plus percentage markup on the costs, for the

---

[1] Neither party consulted legal counsel before entering into the agreement.

3

contract. The markup or percentage after costs will be based on 27% of the total costs, and will be paid upon completion of contract.

The agreement then specified that:

> The contractor will bill on the basis of a daily charge, being a 10 hour work day, and to be paid on a unit basis, small & large. The cost of the large unit would be $4,600.00 a day x quantity of units. The cost of the small unit would be $1,650.00 a day x the quantity of units.

Large units were defined to include five pieces of heavy equipment, three equipment operators, and two hand laborers. Small units included two pieces of heavy equipment, one equipment operator, and two hand laborers. One month after reaching this agreement, the parties signed an addendum to the contract under which Florida Mowing would also provide "final cleanup units," consisting of two pieces of heavy equipment, one equipment operator, and three hand laborers, at a cost of $1,650.00 per day.

Florida Mowing commenced the cleanup work on August 21, 2004, and finished it on January 10, 2005. In total, Florida Mowing performed twenty weeks of work. At the close of a typical work day, the foremen in charge of the work at the manufactured home communities called Wright and informed him of the number of large and small units used that day. Wright noted this information on legal pads, scraps of paper, or cardboard, whatever might be handy when a foreman called. Then, Wright copied the information onto "white boards" at

4

Florida Mowing's home office and discarded his notes. At the end of the work week, he transferred the information on the white boards onto a handwritten invoice, which his wife typed into final form. In all, she prepared twenty weekly invoices reflecting the units employed during the week.[2] Wright forwarded these invoices to Equity on a bi-weekly basis. Equity only disputed one invoice because it contained an arithmetical error.

Florida Mowing also provided Equity with three "summary" invoices. Florida Mowing issued the first summary invoice after week 7. This invoice included only the 27% markup due from weeks 1 through 7. The invoice purported to break down the 27% markup as:

Mobilization & Demobilization @ 12% of Cost

Support Equipment & Personell [sic] @ 10% of Cost

Administrative @ 5% of Cost

Florida Mowing issued the second summary invoice at the end of week 19, to cover the 27% markup for weeks 8 through 19. The third summary invoice,

---

[2] At the beginning of weeks 1 and 2, Florida Mowing issued "temporary" invoices based on its estimate of the number of units it anticipated using during the week. Equity paid the invoices, which were considered advances. At the end of each of those weeks, Florida Mowing issued an "actual invoice" reflecting the number of units used. Florida Mowing offset the amount to be paid under the actual invoice by the amount of the advance Florida Mowing previously had received.

Florida Mowing's final invoice, issued at the end of week 20, and repeated the amounts due in the second summary invoice.[3]

Equity paid twenty-three of the twenty-five invoices Florida Mowing submitted. In February 2005, several weeks after Florida Mowing had completed its work, Equity refused to pay the invoice for week 17, in the amount of $150,245.00, and the final invoice for $413,316.50, which reflected the 27% markup due for weeks 8 through 19. Equity stated that it would not pay those invoices until Florida Mowing provided it with underlying documentation showing the costs Florida Mowing actually incurred for labor and equipment on the job. Florida Mowing responded that it had not retained the underlying documents and that such documentation was unnecessary because the contractual

---

[3] The following chart reflects the total amounts charged by Florida Mowing in each of the weekly and summary invoices:

| Week 1 | $148,060.00 | | Week 8 | $82,342.50 | | Week 16 | $149,650.00 |
|---|---|---|---|---|---|---|---|
| Week 2 | $187,069.86 | | Week 9 | $163,115.00 | | Week 17 | $150,245.00 |
| Week 3 | $196,326.62 | | Week 10 | $96,630.00 | | Week 18 | $65,420.00 |
| Week 4 | $223,800.00 | | Week 11 | $100,665.00 | | Week 19 | $65,895.00 |
| Week 5 | $211,525.00 | | Week 12 | $132,140.00 | | Summary | $413,316.50 |
| Week 6 | $210,600.00 | | Week 13 | $116,375.00 | | Week 20 | $49,606.20 |
| Week 7 | $156,810.00 | | Week 14 | $78,350.00 | | Final | $413,316.50 |
| Summary | $371,385.94 | | Week 15 | $147,595.00 | | | |

term "costs" meant the amounts specified for the large, small, and final cleanup units.

## B.

On April 12, 2005, Florida Mowing brought a breach of contract action against Equity in the Circuit Court of Lee County, Florida, seeking damages in the amount of the unpaid invoices. The next day, Equity sued Florida Mowing in the United States District Court for the Middle District of Florida.[4] Equity's complaint sought (1) a declaratory judgment that Florida Mowing had received all the money it was entitled to receive under the parties' contract and (2) damages for breach of contract, breach of implied covenant of good faith, and unjust enrichment. Equity removed Florida Mowing's action to the district court,[5] and the two cases were consolidated.

Equity thereafter amended its complaint twice, with leave of court.[6] Equity's second amended complaint, filed on October 19, 2005, once again asked the district court to declare that no funds were due and owing to Florida Mowing

---

[4] Equity invoked the district court's diversity of citizenship jurisdiction, 28 U.S.C. § 1332. Equity is a Maryland corporation; Florida Mowing is a Florida corporation.

[5] Equity invoked the district court's removal jurisdiction under 28 U.S.C. § 1441(a).

[6] Equity filed a first amended complaint on May 18, 2005. That amended complaint is not pertinent here.

7

for several reasons, including that Florida Mowing had not provided Equity with the documents underlying its invoices,[7] and that Florida Mowing failed to perform the contract in good faith and to provide Equity with adequate billing documentation showing the costs and expenses it incurred in performing the work.[8] The second amended complaint also sought damages under Florida statutory and tort law.[9]

After the parties engaged in discovery, Equity moved the district court for summary judgment on several issues, one of which lies at the heart of this appeal. Equity asked the court to declare that the word "costs," the basis of the "cost plus" provision, referred to the funds Florida Mowing actually paid for labor and equipment in performing the cleanup work, and the 27% "markup" was multiplied by such payments. Equity contended that Florida Mowing's interpretation of "costs," that "costs" referred to the "unit" costs for labor and equipment, was untenable. The district court rejected Equity's interpretation of "costs," finding,

---

[7] We assume that this allegation applied to the invoices Equity had paid, as well as those it refused to pay. Accordingly, Florida Mowing would have to refund to Equity any sums Equity paid on invoices as to which Florida Mowing could not provide the underlying documentation.

[8] Equity alleged that Florida Mowing's invoices were fraudulent in that they were overstated and unreasonable and "included a profit in its costs and then went on to further add a 27% profit on top of its fraudulent costs."

[9] Equity sought damages under Florida common law for fraud in the inducement and under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq.

8

instead, that "costs" clearly referred to prices the contract fixed for the large units, $4,600, and for the small and final cleanup units, $1,650. The court also rejected Equity's position that if "costs" referred to these unit costs, then Florida Mowing had the burden of proving at trial that such unit costs were reasonable.

The consolidated cases went to trial before a jury on May 23, 2006. On the third day of trial, in a bench conference, Equity's counsel raised what they considered to be a new affirmative defense to Florida Mowing's claim for breach of contract and, at the same time, a new breach of contract claim—that is, Florida Mowing had engaged in "price gouging," billing Equity for units, labor and equipment that were never used.[10] Equity's counsel moved the court to grant a

---

[10] Equity referred to such billing as "price gouging." Equity cited no Florida authority for the existence of a cause of action for "price gouging," and we are aware of none. As best we can discern from the record, Equity used the term "price gouging" to refer to its allegation that some, if not all, of Florida Mowing invoices were fraudulent. Equity apparently failed to realize that this allegation was already included in its answer to Florida Mowing's complaint in the form of its denial that Florida Mowing performed the work represented in its invoices and that Florida Mowing was entitled to recover on the unpaid invoices. Such denial placed the burden of proof on Florida Mowing to establish that it had performed the work indicated in its invoices. Indeed, the district court recognized as much when it instructed the jury as follows at conclusion of the retrial of Florida Mowing's breach of contract claim:

> Florida Mowing has the burden of establishing, by the greater weight of the evidence, that it provided the services set forth in its invoice submitted pursuant to the contract. Equity Lifestyle has no obligation to pay for services unless Florida Mowing establishes, by the greater weight of the evidence, that the services were actually provided.

To the extent that Equity was claiming that it should recover sums it had paid Florida Mowing—because the payments were based on fraudulent invoices—Equity had to amend its complaint because it had not previously asserted such a claim.

9

mistrial in both cases and for leave to file a third amended complaint.[11]  The court

granted the motion for a mistrial,[12] and ordered Equity to file a third amended

complaint.

In doing so, the court gave instructed Equity's counsel as follows:

> The Court is going to require you to file a third amended complaint
> setting forth, in detail, as you've done here, today, the precise
> breaches of contracts that you've articulated.  When this case is
> retried, if you do not prove your case, the Court will impose sanctions
> on you, personally, as well as your client, if the Rule 11 standard is
> [not] satisfied.

To further emphasize the point, the court issued a written order stating that in

drafting the third amended complaint, counsel must

> include all the claims [Equity] wishes to pursue, including the "price
> gouging" portion of Count I . . . .  If Equity Lifestyle includes a
> breach of contract claim, the claim shall specifically identify the
> breaches it alleges, consistent with those articulated to the Court
> during trial on May 25, 2006.

Equity's counsel filed a third amended complaint but did not amend its

breach of contract claim to include the "price gouging" argument.  Instead, Equity

---

[11]  Equity did not ask the court for leave to amend its answer to Florida Mowing's complaint to add an affirmative defense of "price gouging."  Because Equity did not explicitly request leave of court to file an amended answer to Florida Mowing's complaint, the court did not grant such leave.

[12]  We are unaware of any case in which a court has aborted a trial and deprived the plaintiff of its right to pursue a verdict from the jury in the box so that the defendant could amend its pleading, whether its complaint, its answer or a counterclaim.  Florida Mowing strenuously objected to the mistrial and, after the court declared it, moved the court to impose costs and attorney's fees against Equity.  The court denied the motion.

10

asserted three new claims and realleged three of the claims of the second amended complaint. Two new claims sounded in equity: a claim for an accounting and a claim for rescission. The claim for rescission was based on the allegation that Florida Mowing had fraudulently induced Equity to enter into the contract at issue. The third new claim was for fraud but did no more than reiterate Equity's previous claims for fraud in the inducement and violations of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et. seq. ("FDUTPA"). The realleged claims were for damages for fraud in the inducement, unjust enrichment, and for violations of FDUTPA.

On October 20, 2006, the district court entered an order dismissing Equity's third amended complaint with prejudice, on the ground that Equity had failed to comply with the written order it had entered after granting the mistrial.[13] One

_____

[13] Equity failed to comply with the order because the third amended complaint did not include the "price gouging" portion of Equity's breach of contract claim, for which the court had granted the mistrial and leave to file a third amended complaint. In addition to dismissing the third amended complaint for failure to obey its order, the court dismissed the FDUTPA claim because the provisions of the FDUTPA cited in the third amended complaint did not provide for a private cause of action. The court dismissed the claim for unjust enrichment because the existence of an express contract, which both sides relied on, barred the claim. See Williams v. Bear Stearns & Co., 725 So. 2d 397, 400 (Fla. Dist. Ct. App. 1998) (finding that an unjust enrichment claim may not be brought where there is an express contract).

The district court dismissed the fraudulent inducement claim because it found a conflict between Equity's allegation that Florida Mowing misrepresented the amount of profit it intended to make with Equity's allegation that Florida Mowing did not know what its profit might amount to when signed the contract. In other words, the district court found that, taking Equity's allegations as true, there was no false statement of material fact with respect to Florida Mowing's profit. See Simon v. Celebration Co., 883 So.2d 826, 832 (Fla. Dist. Ct. App. 2004) (explaining

11

week later, Equity filed a "Motion to Amend and/or Clarify its Third Amended Complaint," representing that evidence it had just uncovered enabled it to specify precisely how Florida Mowing breached the contract. The district court denied the motion, thereby bringing Equity's case against Florida Mowing to an end.

The court fixed February 6, 2007, as the trial date for Florida Mowing's case against Equity; a jury would determine whether Florida Mowing was entitled to recover on the invoices Equity had refused to pay. Three days prior to the trial, Equity moved the court in limine to preclude Florida Mowing from introducing as evidence copies of the weekly and summary invoices it had sent to Equity during the course of the work. The district court denied the motion, and the case proceeded to trial.

At trial, Florida Mowing introduced the challenged invoices in evidence over Equity's objection and established through the testimony of witnesses that the

_____

that the essential elements for a fraudulent inducement claim are: (1) a false statement of material fact; (2) the maker knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment). Equity obscurely alleges that before the parties entered into their written contract, Florida Mowing represented that the 27% markup would be based on its actual costs on the job, not the large and small units that were employed, and then drafted a contract that based the markup on the units that were used. Although Equity signed the contract, it nonetheless contends that Florida Mowing's pre-contract representation constituted fraud in the inducement. The contention is meritless. See e.g., Rose v. ADT Sec. Servs. Inc., 989 So. 2d 1244, 1247 (Fla. Dist. Ct. App. 2008) ("[A] party cannot establish justifiable reliance and may not recover in fraud for an alleged false statement when proper disclosure of the truth is subsequently revealed in a written agreement between the parties.") (quotation omitted).

units indicated in its invoices reflected the labor and equipment actually used on the job. The jury found for Florida Mowing, returning a verdict in the sum of $563,561.50, the exact amount of the unpaid invoices. Equity now appeals the judgment the court entered pursuant to the jury's verdict and the judgment dismissing its third amended complaint.

## II.

### A.

Equity argues that the district court's dismissal of its third amended complaint constituted an abuse of discretion.[14] We are not persuaded.

A district court has inherent authority to manage its own docket "so as to achieve the orderly and expeditious disposition of cases." Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 2132, 115 L. Ed. 2d 27 (1991). The court may dismiss a claim if the plaintiff fails to prosecute it or comply with a court order. Fed. R. Civ. P. 41(b). "The power to invoke this sanction is necessary in order to prevent undue delays in the disposition of pending cases and to avoid

---

[14] Whether to dismiss a complaint for failure to comply with an order of the court is a matter committed to the district court's discretion. Gratton v. Great Am. Commc'ns, 178 F.3d 1373, 1374 (11th Cir. 1999). Our task, therefore, is to determine whether under the circumstances presented, the district court abused that discretion in dismissing Equity's complaint.

13

congestion in the calendars of the District Court." Durham v. Fla. East Coast Ry. Co., 385 F.2d 366, 367 (5th Cir. 1967).[15]

Equity failed to follow the district court's explicit direction in framing its third amended complaint. The district court bent over backwards to give Equity a chance to present and litigate its new claim for "price gouging" only to discover that all Equity wanted was a mistrial and an opportunity to reconsider its strategy. The mistrial gave Equity's lawyers time to determine whether Florida law recognized a cause of action for "price gouging." Because Florida law does not recognize such a casue of action, they recast Equity's case as a suit for rescission or, if rescission was not available due to the passage of time, a suit for an accounting. If neither of those options was available, counsel would rely on the claims for damages they asserted in Equity's second amended complaint.

In addition to substituting claims for rescission and an accounting for the "price gouging" claim that gave rise to the mistrial and leave to amend, counsel failed to clarify Equity's breach of contract claim, so that the district court and Florida Mowing could fully comprehend what Equity was actually contending. The contract breaches counsel had cited to the court during the bench conference

---

[15] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

14

at trial were not spelled out in the second amended complaint, so in granting Equity leave to amend, the court instructed counsel to set forth in detail, "as you've done here, today, the precise breaches . . . you've articulated." "[The breach of contract claim] . . . shall specifically identify the breaches . . . consistent with those articulated to the court." In drafting the third amended complaint, counsel made no attempt to do that; they simply ignored the court's instruction.

A district court need not tolerate defiance of reasonable orders. See DeSisto College, Inc. v. Line, 888 F.2d 755, 763-64 (11th Cir. 1989) (finding district court did not abuse its discretion in sanctioning counsel under Fed. R. Civ. P. 11 because counsel failed to follow court's explicit instructions to amend the complaint); In re McDonald, 819 F.2d 1020, 1024 (11th Cir. 1987) (finding no abuse of discretion in court's ruling of criminal contempt where attorney refused to follow district court's orders and rulings); see also Byrne v. Nezhat, 261 F.3d 1075, 1131 (11th Cir. 2001) ("Shotgun pleadings, if tolerated, harm the court by impeding its ability to administer justice."). And this order was reasonable to the extreme.

Equity contends that the court abused its discretion in denying its post-dismissal motion to amend or clarify its third amended complaint. We disagree. In deciding whether to grant a party leave to amend a pleading, a district court

15

may consider several factors, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962). All of these factors were present here, and called for the action the court took.

B.

Equity contends that the district court erred in declaring that the word "costs," as used in the term "cost plus," referred to the costs of the large, small, and final clean up units. In arguing its motion for summary judgment, Equity took the position that the word "costs" referred not to the unit prices, but, instead, to the sums Florida Mowing paid out of pocket for the labor and equipment needed to do the cleanup work. Equity takes the same position on appeal and adds an alternative argument, that the unit prices included the 27% markup, the "plus" it was obligated to pay. If we accept either argument, Equity would be entitled to a new trial because, as to the first argument, Florida Mowing failed to establish how much it paid for labor and equipment, and as to the second argument, the amount charged in the invoices was excessive because of the additional 27% Equity paid for.

In interpreting a contract under Florida law, we "give effect to the plain language of contracts when that language is clear and unambiguous." Arriaga v. Fla. Pacific Farms, L.L.C., 305 F.3d 1228, 1246 (11th Cir. 2002); Hamilton Constr. Co. v. Bd. of Pub. Instruction of Dade County, 65 So. 2d 729, 731 (Fla. 1953).[16]  We must read the contract to give meaning to each and every word it contains, and we avoid treating a word as redundant or mere surplusage "if any meaning, reasonable and consistent with other parts, can be given to it." Roberts v. Sarros, 920 So. 2d 193, 196 (Fla. Dist. Ct. App. 2006).

We are dealing here with a "cost-plus" contract because the agreement states: "this will be a cost plus percentage markup on the costs, for the contract." A cost-plus contract is one "where one party is entitled to a designated percentage for profit over and above his costs." Robert A. Huggins Gen. Contractor, Inc. v. N.B. Willoughby, 595 So. 2d 1003, 1004 (Fla. Dist. Ct. App. 1992).

In a cost-plus contract, typically, the percentage of profit is calculated based on the actual costs of completing the task. See J.S.L. Constr. Co. v. Levy, 994 So. 2d 394, 401 (Fla. Dist. Ct. App. 2008); Sharrard v. Ligon, 892 So. 2d 1092, 1094-

_____

[16]  In moving for summary judgment, Equity represented to the district court that there were no material issues of fact to be resolved; that is, that the contract was unambiguous and, for this reason, parole evidence was not needed to interpret its terms, including the terms at issue here.  In that the district court's contract interpretation presents a pure question of law, we review its interpretation de novo.  See Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co., 320 F.3d 1260, 1267 (11th Cir. 2003).

17

95 (Fla. Dist. Ct. App. 2004). In this case, however, the district court found that the percentage of profit was to be calculated based on the unit prices, regardless of the relationship between those unit prices and the actual costs accrued by Florida Mowing, based on the following portion of the contract:

> The contractor will bill on the basis of a daily charge, being a 10 hour work day, and to be paid on a unit basis, small & large. The cost of the large unit would be $4,600.00 a day x quantity of units. The cost of the small unit would be $1,650.00 a day x the quantity of units.

If we accept either of Equity's alternative arguments, we would be rendering language of contract relating to unit costs or percentage markup mere surplusage. See State Farm Fire & Cas. Inc. Co. v. Deni Assocs. of Florida, 678 So. 2d 397 (Fla. 4th Dist. Ct. App. 1996) (describing that the interpretation of a contract depends "not on the parties having meant the same thing but on their having said the same thing"). Equity's first argument is that "costs" refers to the amounts Florida Mowing paid for labor and equipment. If so, in paying an invoice, Equity was simply giving Florida Mowing an advance against those amounts, because the invoice never reflected the amounts paid for labor and equipment. The word "advance" appears nowhere in the agreement, and nothing in its language even suggests that Florida Mowing's invoices amounted to

18

requests for advances.[17]  The second argument assumes that "costs" refers to the

unit prices and concludes that those unit prices included the 27% markup.

Assuming that argument to be true, the phrase "[t]he markup or percentage after

costs will be based on 27% of the total costs" is mere surplusage.  We cannot

accept either of Equity's alternative arguments because, in doing so, we would be

rewriting the parties agreement.[18]

C.

Equity contends that the district court improperly admitted the weekly and

summary invoices because those invoices constituted hearsay.  A district court has

broad discretion in determining the admissibility of evidence; we reverse an

---

[17]  As indicated in note 2 supra, Florida Mowing's invoices at the beginning of weeks 1 and 2 were temporary invoices, the payment of which by Equity constituted advances.  Equity used these advances as set offs when paying the invoices Florida Mowing issued at the end of those weeks.  After week 2, Equity made no further advances.

[18]  Equity's brief raises an issue that is tangentially related to its argument that the district court erred in interpreting the word "costs."  The issue is whether, at trial, the court abused its discretion in sustaining Florida Mowing's objection to a question Equity put to Barbara Stanze as she was testifying in Florida Mowing's case in chief.  Equity asked her the following question: "What was your understanding as to the part of the contract, ma'am, that says that the cost of a large unit would be $4,600, and the cost of the small unit would be $1650?"  Florida Mowing objected to the form of the question.  Florida Mowing did not object on the ground that since the contract was unambiguous, Stanze's "understanding" of what the unit costs meant was immaterial. See Ellinger v. United States, 470 F.3d 1325, 1338 (11th Cir. 2006). The court sustained the objection.  Equity did not rephrase the question, but argues that the court sustained the objection on the ground that the question called for parol evidence as to the meaning the word "costs."  We find no abuse of discretion in the court's handling of the objection.  The question was both ambiguous and compound.

evidentiary ruling only "upon a clear showing of abuse of discretion." Walker v. NationsBank of Fla. N.A., 53 F.3d 1548, 1554 (11th Cir. 1995).

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is inadmissible unless it meets one of the exceptions to the hearsay rule. See Fed. R. Evid. 803. Florida Mowing acknowledged that the invoices constituted hearsay, but it introduced them under the rule as documents

> made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the [documents], all as shown by the testimony of the custodian or other qualified witness.

Fed. R. Evid. 803(6). "The touchstone of admissibility under the business records exception to the hearsay rule is reliability." United States v. Bueno-Sierra, 99 F.3d 375, 378 (11th Cir. 1996). A document may not be introduced if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6).

The predicate requirements of Rule 803(6) were met through Julian Wright's testimony. Wright testified that the invoices were made in the evening of each day based upon notes made contemporaneously with his scheduling of the

units that were sent to the job sites and his receipt of the foremen's daily reports. Wright had first-hand knowledge of the units he dispatched to the work sites, the foremen had first-hand knowledge of the units actually used, and he and the foremen were all acting in the regular course of business. See T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc., 931 F.2d 816, 828 (11th Cir. 1991) ("For this exception to be available, all persons involved in the process must be acting in the regular course of business—otherwise an essential link in the trustworthiness chain is missing."). Moreover, Equity did not dispute that this information was compiled and kept in the regular course of Florida Mowing's business.

Equity argues that the district court erred on two grounds in finding that the invoices were trustworthy.[19] First, it contends that Florida Mowing did not produce witnesses who could confirm that the number of units listed on the invoices matched the number of units used during the week. This does not relate to the trustworthiness of the source of the invoices or the method of their preparation; rather, it relates to the credibility of the information presented in the

---

[19] Under Fed. R. Evid. 104(a), in determining that the invoices were admissible, the district court first had to find as fact that they were trustworthy. See City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 565 (11th Cir. 1998) ("Rule 104(b) allows a district court to determine preliminary questions of fact necessary to apply the Federal Rules of Evidence."). We review under the clearly erroneous doctrine the court's fact finding on this preliminary issue. See SunAmerica Corp. v. Sun Life Assurance Co. of Canada, 77 F.3d 1325, 1333 (11th Cir. 1996).

invoices, which is a question for the jury to weigh. United States v. Garnett, 122 F.3d 1016, 1019 (11th Cir. 1997). Equity had the opportunity to cross-examine Wright and call witnesses to controvert the accuracy of Florida Mowing's invoices.

Second, Equity contends that because the notes Wright made of the foremen's reports, i.e., the underlying documents, were destroyed, there may have been mistakes in the transferral of the information to the final invoices. But Equity has presented little to combat Wright's trustworthiness. Equity paid twenty-three of the twenty-five invoices without question as to the accuracy of Wright's compilations. Furthermore, several of Equity's own witnesses testified to Wright's truthfulness. The district court did not clearly err by finding that Wright's testimony suggested the trustworthiness of these documents even though he did not type the final invoices and was not present at all of the work sites each day. See Garnett, 122 F.3d at 1019 ("It is not necessary for the person who actually prepared the documents to testify so long as there is other circumstantial evidence and testimony to suggest the trustworthiness of the documents.").

## III.

For the reasons stated herein, the judgment of the district court is AFFIRMED.

22