**MONEX FINANCIAL SERVICES LTD., and Planet Payment, Inc., Plaintiffs,**

v.

**NOVA INFORMATION SYSTEMS, INC., Defendant.**

**No. 07 Civ. 5837(WHP).**

United States District Court, S.D. New York.

Sept. 21, 2009.

---

Richard L. Crisona, Esq., Abelman Frayne & Schwab, New York, NY, for Plaintiffs.

Charles E. Dorkey, III, Esq., McKenna Long & Aldridge, New York, NY, for Defendant.

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge:

Plaintiffs Monex Financial Services Ltd. ("Monex") and Planet Payment, Inc.

("Planet Payment" and collectively, "Plaintiffs") bring this action against Defendant Nova Information Systems, Inc. ("Nova") for breach of contract. Plaintiffs allege that contrary to their agreement, Nova failed to (1) use reasonable efforts to help Plaintiffs secure certain business and (2) continue certain revenue-share payments to Plaintiffs. Nova moves for summary judgment on both claims and Plaintiffs move for summary judgment on the second claim. For the following reasons, Nova's motion for summary judgment is granted in part and denied in part and Plaintiffs' motion for partial summary judgment is denied.

## BACKGROUND

### I. *The Parties*

Monex and Planet Payment offer multi-currency credit card processing services, including Dynamic Currency Conversion ("DCC"). (Plaintiffs' Rule 56.1 Statement dated Feb. 27, 2009 ("Pls. 56.1 Stmt.") ¶ 1.) DCC is a process by which credit card purchases made by a cardholder traveling abroad are converted at the point of sale into the cardholder's home currency. (Nova's Rule 56.1 Statement dated Feb. 27, 2009 ("Nova 56.1 Stmt.") ¶ 4; Pls. 56.1 Stmt. ¶ 2.) Thus, through a real time conversion, the consumer is billed in its home currency and the merchant is paid in local currency. (Pls. 56.1 Stmt. ¶ 2.) For this service, the consumer pays a fee of 3% of the face amount of the transaction. (Pls. 56.1 Stmt. ¶ 2.) The fee is usually divided among the merchant, the DCC processor and the merchant's credit card processor. (Pls. 56.1 Stmt. ¶ 2.) Nova, which known today as Elavon, Inc., provides integrated payment processing services for credit card transactions to merchants and financial institutions. (Pls. 56.1 Stmt. ¶ 17.)

### II. *The Teaming Agreement*

On December 10, 2001, Planet Payment, Monex, Planet Monex, Inc., and Global Card Services, Inc. ("GCS") executed the "Planet Monex, Inc. Teaming Agreement with Global Card Services, Inc." (the "Teaming Agreement"). (Nova 56.1 Stmt. ¶ 1; Pls. 56.1 Stmt. ¶ 3.) GCS, now owned by Nova, provides a "Gateway" that facilitates the delivery of credit card transactions from a merchant to a credit card processor. (Nova 56.1 Stmt. ¶ 5; Pls. 56.1 Stmt. ¶ 19.) The "Purpose" section of the Teaming Agreement provides: "The parties shall work together to develop the systems necessary to enable DCC services to be provided to their respective clients. The parties wish to work together to provide DCC services to GCS Merchants and so that Planet Payment can use and sell the White Label Products to provide any portion of the [Planet Payment Solution] including processing of DCC services to Planet Payment Merchants." (Pls. 56.1 Stmt. ¶ 4.) Thus, the Teaming Agreement envisions two principal areas of cooperation: (1) between Planet Payment and GCS to supply Planet Payment DCC services to GCS customers; and (2) GCS's provision and operation of unbranded (or "White Label") Gateway services to Planet Payment for Planet Payment's re-sale to its customers under its own brand. (Declaration of Alan F. Kaufman dated Feb. 27, 2009 ("Kaufman Decl.") Ex. A: Teaming Agreement at 1.) As part of the Teaming Agreement, GCS agreed to modify its Gateway software to enable Planet Payment to process DCC transactions for merchants using GCS's Gateway. (Teaming Agreement at 2.)

The Teaming Agreement provided that net revenue from the DCC operations would be split evenly between the parties for merchants using the GCS Gateway who chose Planet Payment as their DCC pro-

vider. (Teaming Agreement at 3.) Planet Payment also agreed to pay GCS 0.1% of the dollar volume of DCC services Planet Payment provided to its customers on the "White Label Products." (Teaming Agreement at 3.) The "Revenue Share" provision of the Teaming Agreement also provided that the parties would share revenue from customers where one or the other was excluded. (Teaming Agreement at 3.) Specifically, the Teaming Agreement provided, "for all DCC business signed by Planet Payment with GCS Merchants ... that excludes GCS, GCS shall receive 50% of the DCC revenue derived by Planet Payment[, and] ... if GCS signed business for DCC that excludes Planet Payment then GCS shall pay Planet Payment 50% of the DCC revenue derived by GCS." (Teaming Agreement at 3.) However, this revenue share for business that excluded one party included a provision that "if Planet Payment is excluded ... because Planet Payment can not offer the merchant a specific solution requested ..., or Planet Payment after a reasonable period can not, in the merchant's sole discretion, adequately address creditworthiness or other significant economic concerns raised by the merchant, then Planet Payment shall not be entitled to 50% of the DCC revenue derived by GCS from [that] merchant." (Teaming Agreement at 3.)

The "Term" provision of the Teaming Agreement provides:

> The initial term of [the Teaming Agreement] shall be 5 years with regard to new business and the parties shall continue to process transactions for merchants whose business is procured under [the Teaming Agreement] after the initial term of this [Teaming Agreement], upon the terms and conditions set forth in [the Teaming Agreement] as long as the merchant continues to use the GCS or White Label Products.

(Teaming Agreement at 3.)

The Teaming Agreement also provides that "[i]n the event that a GCS Merchant or prospective merchant desires to use another DCC solution and after reasonable effort on GCS' part such merchant cannot be convinced to utilize the [Planet Payment] Solution, GCS shall be free to support such merchant subject to the revenue share as set forth above." (Teaming Agreement at 4.) Additionally, the parties agreed to "formulate a sales plan" and "use reasonable efforts to assist the other in selling and fulfilling the services contemplated hereunder." (Teaming Agreement at 5.)

## III. *Princess*

Princess Cruise Lines ("Princess") has been a client of GCS since at least 1996. (Nova 56.1 Stmt. ¶ 21.) In September 2002, Plaintiffs began to solicit Princess for the provision of DCC services. (Plaintiffs' Disputed 56.1 Statement dated Mar. 20, 2009 ("Pls. Disputed 56.1 Stmt.") ¶ 21.) After Plaintiffs signed a non-disclosure agreement with Princess, they engaged in discussions. (Pls. Disputed 56.1 Stmt. ¶ 22.) However, Princess never entered into an agreement with Plaintiffs. (Nova 56.1 Stmt. ¶¶ 22–24.) Instead, Princess chose Dynamic Currency Conversion, Inc. ("DCCI") as its DCC provider and entered into a contract with DCCI on December 31, 2003. (Nova 56.1 Stmt. ¶ 25.) The parties dispute whether GCS made any efforts to promote Plaintiffs' DCC services to Princess. (Pls. Disputed 56.1 Stmt. ¶ 23; Nova's Counterstatement to Plaintiffs' Disputed 56.1 Stmt. dated Mar. 30, 2009 ("Nova Disputed 56.1 Stmt.") ¶ 23.) The parties also dispute whether GCS was working with DCCI on a competing DCC solution for Princess at the same time

Plaintiffs were trying to sign Princess's business. (Pls. Disputed 56.1 Stmt. ¶ 28; Nova Disputed 56.1 Stmt. ¶ 28.)

After DCCI and GCS began providing DCC services to Princess, GCS initially refused to pay Plaintiffs a 50% share of the revenue. (Nova 56.1 Stmt. ¶ 28.) Following an exchange of letters and emails that included threats of legal action by Plaintiffs against GCS, the parties executed a letter dated July 21, 2005 (the "July 2005 Letter") agreeing to bank routing instructions, and GCS and its parent company began paying the revenue share. (Nova 56.1 Stmt. ¶ 29; Kaufman Decl. Ex. U: Letter from Mark Silverman to Frank Murphy dated Apr. 30, 2004; Ex. V: Letter from Mark Silverman to Frank Murphy and Philip Beck dated July 15, 2005; Ex. Y: Letter from Frank Murphy to Mark Silverman dated Mar. 30, 2004; Letter from Frank Murphy to Mark Silverman dated May 26, 2004.) The July 2005 Letter is addressed to Ron Nation of First Horizon Merchant Services, Inc. ("First Horizon") and Mark Silverman of GCS, and is signed by Philip D. Beck on behalf of Planet Payment, Frank Murphy on behalf of Monex, and both Murphy and Beck on behalf of Planet Monex, Inc. (Kaufman Decl. Ex. AA: July 2005 Letter.) The July 2005 Letter only provides bank routing instructions for Planet Payment's account, and states:

> By their signature hereto Planet [Payment], Monex, and [Planet Monex, Inc.] have agreed that GCS and/or First Horizon Merchant Services, Inc. on behalf of GCS is hereby irrevocably authorized and requested to make payment of all amounts now due, or due hereafter from GCS under the [Teaming Agreement], to the above account in Planet [Payment]'s name. Planet [Payment] has agreed to remit Monex's share within three business days of receipt.

(July 2005 Letter.) The parties dispute whether the July 2005 Letter settled the dispute or represented GCS's capitulation regarding the revenue share requirement. The July 2005 Letter does not answer this question because it is bereft of any other terms. (Nova 56.1 Stmt. ¶ 29; Pls. Disputed 56.1 Stmt. Response ¶ 29.)

## IV. *Acquisition of GCS by Nova*

In August 2007, First Horizon Merchant Services, Inc. ("First Horizon") acquired GCS as a wholly-owned subsidiary. (Pls. 56.1 Stmt. ¶ 17.) On January 31, 2006, First Horizon's parent company entered into a Merchant Asset Purchase Agreement (the "MAPA") with Nova to sell First Horizon's assets, including GCS, to Nova. (Pls. 56.1 Stmt. ¶ 18; Nova 56.1 Stmt. ¶ 30.) The effective date of the MAPA was March 1, 2006. (Nova 56.1 Stmt. ¶ 30.) The MAPA provides that Nova shall assume certain contracts of First Horizon. (Kaufman Decl. Ex. BB: MAPA § 3.1(a), (e).) The MAPA specifically limits Nova's liabilities to those expressly assumed under the agreement, and only to those liabilities incurred after March 1, 2006. (MAPA § 3.1(a).)

In May 2006, the parties entered into "Consent to Assignment and Assumption of Obligation" (the "Assignment"), effective March 1, 2006. (Kaufman Decl. Ex. CC: Assignment) The Assignment provided for GCS's assignment of "all of [GCS's] rights and obligations under the Teaming Agreement to Nova[,]" Nova's acceptance of "all of GCS's rights and obligations under the [Teaming Agreement] and [assumption] of the duties and obligations associated with the Teaming Agreement." (Assignment.) Finally, the Assignment provides that "[Planet Payment], Monex, and [Planet Monex] consent to the assignment of the Teaming Agreement from GCS to Nova and will view Nova as the

obligor under the Teaming Agreement as of [March 1, 2006]." (Assignment.)

## V. *Royal Caribbean*

On July 29, 2002, Monex and Royal Caribbean Cruise Lines ("Royal Caribbean") entered into an agreement for Monex to provide DCC services to Royal Caribbean. (Nova 56.1 Stmt. ¶ 10.) Neither GCS, Planet Payment, nor Planet Monex, Inc. were parties to the agreement between Monex and Royal Caribbean. (Nova 56.1 Stmt. ¶ 11.) Monex provided DCC services to Royal Caribbean for approximately four years. (Nova 56.1 Stmt. ¶ 13.) However, on June 8, 2006, Royal Caribbean instructed Nova to switch Royal Caribbean's DCC provider from Monex to DCCI. (Nova 56.1 Stmt. ¶ 14.) On July 30, 2006, Royal Caribbean and DCCI entered into a contract for DCC services. (Nova 56.1 Stmt. ¶ 15.) The parties dispute whether Nova made any efforts to convince Royal Caribbean to continue to use Plaintiffs' DCC services. (Pls. Disputed 56.1 Stmt. ¶ 18; Nova Disputed 56.1 Stmt. ¶ 18.)

## VI. *The Nassau County Litigation*

Plaintiffs have filed two additional lawsuits: one in the Eastern District of New York against Nova and the other in New York State Supreme Court, Nassau County, against DCCI, Mark Silverman (the former president of GCS), and David Nahor (a DCCI executive). In the Nassau County Litigation, Plaintiffs brought claims for tortious interference with contractual relations against DCCI and Silverman, asserting that they tortiously procured the breach of the Teaming Agreement by GCS and Nova for the Princess and Royal Caribbean business by convincing Nova and GCS not to use reasonable efforts to aid Plaintiffs. On April 24, 2009, Justice Stephen Bucaria granted

a motion for summary judgment, dismissing the claim of tortious interference with contractual relations with respect to Princess. The Court held, *inter alia,* that DCCI and Silverman did not induce any breach, and that "plaintiffs have failed to furnish any evidence that GCS did not use 'reasonable efforts' to convince its customers to use their currency conversion system as opposed to the services offered by Dynamic." *Monex Fin. Serv. Inc. v. Dynamic Currency Conversion, Inc.,* No. 21215/06, Slip Opinion at 9–10, 2009 WL 1269482 (N.Y. Sup.Ct. Nassau Cty. Apr. 24, 2009). As for the tortious interference claim relating to Royal Caribbean, the court found that "Plaintiffs have no factual support for their argument ... that Nova failed to use 'reasonable efforts' to convince [Royal Caribbean] to continue to use Plaintiffs' DCC services." *Monex,* Slip Opinion at 15. The court also found that "neither Silverman nor Nahor attempted to persuade or encourage Nova to refrain from trying to convince [Royal Caribbean]...." *Monex,* Slip Opinion at 15.

## VII. *The Current Dispute*

After December 10, 2006, Nova stopped paying the revenue share from the Princess and Royal Caribbean DCC business. Nova continues to process credit card transactions for both Royal Caribbean and Princess.

## *DISCUSSION*

### I. *Legal Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Davis v. Blige,* 505 F.3d 90, 97 (2d Cir.2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (quoting *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007)).

## II. *Breach of Contract*

### A. *Best Efforts*

 "The elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Rollins, Inc. v. Butland,* 951 So.2d 860, 876 (Fla.Dist.Ct.App.2006).[1] There are no Florida cases interpreting a "reasonable efforts" clause.[2] "New York courts use the term 'reasonable efforts' interchangeably with 'best efforts.'" *Scott–Macon Sec., Inc. v. Zoltek Co.,* No. 04 Civ. 2124(MBM), 2005 WL 1138476 (S.D.N.Y. May 12, 2005). One Florida court has addressed a "best efforts" clause noting

that it could "locate no definition of 'best efforts' in Florida law," and that "[t]he definition of 'best efforts' may vary depending on the factual circumstances surrounding the transaction and the intent of the parties entering into the transaction." *First Nat'l Bank of Lake Park v. Gay,* 694 So.2d 784, 787, 788 (Fla.Dist.Ct.App.1997). New York courts have explained that "a 'best efforts' clause imposes an obligation to act with good faith in light of one's own capabilities.'" *Bloor,* 601 F.2d at 613 n. 7.

Under either formulation, the record submitted by the parties does not establish that as a matter of law either Nova or GCS used "reasonable efforts" to fulfill its duties to Plaintiffs under the Teaming Agreement. While Nova and GCS made some effort to put Plaintiffs in touch with Princess and Royal Caribbean and to alert Plaintiffs of Princess's and Royal Caribbean's needs, Plaintiffs also submitted testimony, some by Nova's own witnesses, that Nova and GCS made *no* effort to aid Plaintiffs in obtaining DCC business from Princess or Royal Caribbean. Given the diametrically opposed evidence and the limited record before the Court, there are material factual disputes regarding whether Nova or GCS made "reasonable efforts" as required under the Teaming Agreement. Accordingly, Nova's motion is denied. *See Cox v. CSX Intermodal, Inc.,* 732 So.2d 1092, 1098 (Fla.Dist.Ct.App. 1999) (finding summary judgment on good faith and fair dealing claim improper where on limited record Court could not

---

**1.** The Teaming Agreement provides that it will be construed in accordance with the laws of the State of Florida without regard to the conflicts-of-law provisions thereof. (Teaming Agreement at 5.) The parties agree that Florida law applies.

**2.** The attorneys drafting the Teaming Agreement fearlessly selected a term, "reasonable efforts," undefined within the law of the state

selected by the choice of law clause. Judge Friendly lamented that "New York law [regarding best efforts clauses] is far from clear and it is unfortunate that a federal court must have to apply it." *Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609, 613 n. 7 (2d Cir.1979). Here, this Court is put to the task of applying non-existent Florida law.

determine if defendant was acting in good faith).

## B. *Revenue Sharing*

"[W]here the determination of the issues of a lawsuit depends upon the construction of a written instrument and the legal effect to be drawn therefrom, the question at issue is essentially one of law only and determinable by entry of summary judgment." *Volusia Cty. v. Aberdeen at Ormond Beach, L.P.*, 760 So.2d 126, 131 (Fla.2000) (quoting *Cox*, 732 So.2d at 1096). If, however, there are "two reasonable interpretations" of a contract, "summary judgment is inappropriate because there is a genuine issue of material fact." *See Fecteau v. Southeast Bank, N.A.*, 585 So.2d 1005, 1007 (Fla.Dist.Ct. App.1991). This is because "[w]hen a contract is ambiguous and the parties suggest different interpretations, the issue of the proper interpretation is an issue of fact requiring the submission of evidence extrinsic to the contract bearing upon the intent of the parties.'" *Fecteau*, 585 So.2d at 1007 (quoting *Bacardi v. Bacardi*, 386 So.2d 1201, 1203 (Fla.Dist.Ct.App.1980)). Whether an ambiguity exists in a contract is a question of law, *Torwest, Inc. v. Killilea*, 942 So.2d 1019, 1020 (Fla.Dist.Ct.App. 2006), and "depends upon whether it is reasonably susceptible to more than one interpretation ... [and] does not exist merely because a document can possibly be interpreted in more than one manner." *Lambert v. Berkley S. Condo. Ass'n*, 680 So.2d 588, 590 (Fla.Dist.Ct.App.1996) (citation omitted).

"In interpreting a contract under Florida law, [courts] 'give effect to the plain language of contracts when that language is clear and unambiguous.'" *Equity Lifestyle Prop., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1242 (11th Cir.2009) (quoting *Arriaga v. Fla.*

*Pac. Farms, L.L.C.*, 305 F.3d 1228, 1246 (11th Cir.2002)). "In construing the language of a contract, courts are to be mindful that 'the goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose.'" *Taylor v. Taylor*, 1 So.3d 348, 350 (Fla.Dist.Ct.App.2009) (quoting *Delissio v. Delissio*, 821 So.2d 350, 353 (Fla.Dist.Ct.App.2002)). "The court should reach a contract interpretation consistent with reason, probability, and the practical aspect of the transaction between the parties." *Whitley v. Royal Trails Property Owners' Ass'n, Inc.*, 910 So.2d 381, 383 (Fla.Dist.Ct.App.2005).

"When the terms of a contract are ambiguous, parol evidence is admissible to 'explain, clarify or elucidate' the ambiguous terms." *Taylor*, 1 So.3d at 350 (quoting *Strama v. Union Fid. Life Ins. Co.*, 793 So.2d 1129, 1132 (Fla.Dist.Ct.App. 2001)). "However, a trial court should not admit parol evidence until it first determines that the terms of a contract are ambiguous." *Taylor*, 1 So.3d at 351.

Here, the contract is unambiguous—the term of contract is for only five years and does not require that Nova continue revenue share payments when one party was excluded after the five-year term. Indeed, the only exception to the five-year term is where "the parties ... continue to process transactions for merchants whose business is procured under this Agreement. ..." "Procured" is generally defined as "to get possession of by particular care and effort." *Webster's Third International Dictionary* 1809 (1993). Revenue that the parties passively share from business that they were unable to jointly obtain cannot be characterized as obtained by "particular care and effort." Therefore, the remainder of the sentence explains that this exception only applies when "parties ... continue to process

transactions," indicating that this exception relates to activity by both the parties and not passive revenue sharing.

This plain meaning is supported by the purpose and structure of the Teaming Agreement. As the "Purpose" section of the Teaming Agreement makes clear, the Teaming Agreement is intended to facilitate the parties' cooperation to develop business jointly. Moreover, the revenue share for excluded business does not require GCS (or Nova) to share revenue if there is a business justification for the merchant's decision to exclude Plaintiffs. Thus, where one party is excluded, the revenue share provision constitutes a penalty. Revenue that is shared as a penalty is even further removed from business "obtained by particular care and effort." Accordingly, the revenue share from Princess and Royal Caribbean appropriately ended when the contract expired. Nova's motion for summary judgment dismissing the second claim for relief is granted.[3]

### III. *Damages*

 While "[a]n award of lost profits cannot be based on mere speculation or conjecture," *N. Dade Cmty. Dev. Corp. v. Dinner's Place, Inc.*, 827 So.2d 352, 353 (Fla.Dist.Ct.App.2002), such damages are available "as long as they are established with reasonable certainty," *4 Corners Ins., Inc. v. Sun Publ'ns of Fla., Inc.*, 5 So.3d 780, 783 (Fla.Dist.Ct.App.2009). Nova seeks to dismiss both claims because they seek damages for a limitless period of time. However, the only remaining claim that remains relates to Nova's alleged failure to use reasonable efforts to help Plaintiffs secure the Princess and Royal Caribbean business. At this point—with expert

discovery not yet complete—and with the limited record on damages before it, this Court cannot conclude that it is impossible for Plaintiffs to prove damages. Accordingly, this Court denies without prejudice Nova's motion for summary judgment with respect to damages.

### IV. *Collateral Estoppel*

 In granting summary judgment in the Nassau County Action, the court found that Silverman and DCCI did not induce a breach of the Teaming Agreement and alternatively that neither GCS nor Nova breached the Teaming Agreement. Nova now seeks summary judgment based on collateral estoppel. However, except in very narrow circumstances, New York courts do not extend preclusive effect to decisions based on alternative grounds. *See Tydings v. Greenfield, Stein & Senior, LLP*, 11 N.Y.3d 195, 868 N.Y.S.2d 563, 897 N.E.2d 1044, 1047 (2008). The circumstance New York courts require to apply the exception—that Plaintiffs could have appealed, but did not—is not present here. *See Tydings*, 868 N.Y.S.2d 563, 897 N.E.2d at 1047. Accordingly, Nova's motion for summary judgment based on collateral estoppel is denied.

### V. *Assignment*

 "Generally, rights under a contract are assignable." *Gables Ins. Recovery, Inc. v. Seminole Cas. Ins. Co.*, 10 So.3d 1106, 1108 (Fla.Dist.Ct.App.2009); *see also New Holland, Inc. v. Trunk*, 579 So.2d 215, 217 (Fla.Dist.Ct.App.1991). Under Florida law, an assignor conveys to the assignee his or her rights and interests in the property or interest assigned. *See State of Fla. v. Family Bank of Hallan-*

---

**3.** Nova also argues that the First Claim for Relief should be dismissed based on the five year term limitation. However, the term provision has no bearing on the allegations that

Nova and its predecessors breached the Agreement when they failed to use "reasonable efforts" to help Plaintiff obtain the DCC business of Princess and Royal Caribbean.

*dale,* 667 So.2d 257, 259 (Fla.Dist.Ct.App. 1995). In other words, the "assignee 'stands in the shoes' of the assignor," *Foster v. Foster,* 703 So.2d 1107, 1109 (Fla. Dist.Ct.App.1997); *see also Cadle Co. II, Inc. v. Stamm,* 633 So.2d 45, 46 (Fla.Dist. Ct.App.1994), and has the same rights and status as the assignor, *Gables,* 10 So.3d at 1108. Moreover, "it is established that an assignee of an account takes the account subject to all outstanding equities and cannot occupy a better position than the assignor." *Prestress Erectors, Inc. v. James Talcott, Inc.,* 213 So.2d 296, 298 (Fla.Dist. Ct.App.1968) (citing *Fla. East Coast Ry. Co. v. Eno,* 99 Fla. 887, 128 So. 622 (1930)).

 Nova argues that it did not assume any liabilities arising before March 1, 2006. However, the Assignment simply states that Nova "accepts assignment of all of GCS's rights and obligations under the agreement and will assume all duties and obligations associated with the Teaming Agreement." While the Assignment does state that the Plaintiffs will view Nova as the obligor as of March 1, 2006, Florida law presumes that an assignee "stands in the shoes of the assignor." Because of the otherwise unconditional language of the Assignment, the reference to March 1, 2006 is not enough to limit liability. As for the MAPA, while it may provide Nova with a cause of action for indemnity against First Horizon's seller, it cannot limit Nova's liability to Plaintiffs, who were not parties to the MAPA.

VI. *Prior Settlement*

 Nova also argues that the payments made by it and its predecessor represented an amicable settlement of the claims. As an initial matter, Nova did not raise the defense of accord and satisfaction in its answer. However, "[n]otwithstanding a defendant's failure to timely plead [an affirmative defense], a district court may still entertain affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Saks v. Franklin Covey Co.,* 316 F.3d 337, 350 (2d Cir.2003). "In such circumstances, a district court, may construe the motion for summary judgment as a motion to amend defendant's answer." *Saks,* 316 F.3d at 350–51 (quotation marks omitted). Plaintiffs have not articulated any prejudice from consideration of the defense. Moreover, the defense has been the subject of thorough discovery by both parties, and will not delay the proceedings. Accordingly, this Court considers Nova's motion for summary judgment as a motion to amend its answer to state an affirmative defense of accord and satisfaction, and grants it.

 However, there are material disputes of fact regarding whether any accord or satisfaction exists and if so, its scope. Specifically, the parties dispute whether the payments were made in settlement of all claims between the parties or just a capitulation by Nova and GCS on whether revenue share was warranted. Accordingly, Nova's request for summary judgment based on the defense of accord and satisfaction is denied.

*CONCLUSION*

For the foregoing reasons, Defendant Nova Information Systems, Inc.'s motion for summary judgment (Docket No. 27) is granted in part and denied in part. The Second Claim for Relief is dismissed. Defendants may assert the affirmative defense of accord and satisfaction. Plaintiffs' motion for summary judgment,(Docket No. 22) is denied. This Court will hold a conference on October 9, 2009, at 11:00 a.m.