[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13054
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cv-22664-DLG

JANET DIXON,
individually,

Plaintiff-Appellant,

versus

PUBLIC HEALTH TRUST OF DADE COUNTY,
d.b.a. Jackson Memorial Hospital,
a.k.a. Jackson Health Systems,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 29, 2014)

Before CARNES, Chief Judge, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

Janet Dixon sued her former employer, alleging that it violated her rights under the Family Medical Leave Act (FMLA) and the collective bargaining agreement (CBA) between her union and her employer.  The district court dismissed her FMLA claims for failure to state a claim, then granted summary judgment to her employer on her CBA claims because she failed to exhaust that agreement's administrative remedies.  This is her appeal.

I.

Dixon worked as a patient care technician at Jackson Memorial Hospital (Jackson).[1]  Jackson is owned and operated by the Public Health Trust of Miami-Dade County (the Public Health Trust), the governing body created by Miami-Dade County's Board of County Commissioners.  In August 2011 she asked for a temporary leave of absence so she could care for her seriously ill mother.  Her requested was granted, and Dixon began her leave on September 25, 2011.[2]

---

[1] Because Dixon challenges the Rule 12(b)(6) dismissal of her FMLA claims, we take these facts from her complaint, accepting its account as true and construing it in the light most favorable to Dixon, see Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009).

[2] The date on which Dixon's leave began is somewhat unclear.  The first exhibit that Dixon attached to her complaint, which was comprised of two letters from Jackson's human resources agency, indicated that her leave began on either September 22 or September 25, 2011.  That exhibit's first letter, dated November 1, 2011, begins: "You are currently out on an approved leave of absence as of 9/22/2011 to 11/20/2011."  The second letter, dated September 27, 2011, starts by noting that Dixon's FMLA leave "has been 'Qualified' from 9/25/11 through 3/24/12." We will assume her leave began on September 25 because that is the more favorable inference for Dixon.  See Belanger, 556 F.3d at 1155.

Jackson's human resources agency[3] told Dixon that it "would work out the leave to combine private and FMLA leave so that the leave would be valid into the year 2012." She attached to her complaint a copy of a letter from the Public Health Trust approving her for "qualified" leave from September 25, 2011, to March 24, 2012.

Dixon did not receive the leave she was initially promised. Jackson sent Dixon a letter on November 1, 2011, telling her that she needed to return to work on November 23, 2011. Dixon spoke with Jackson's human resources agency and asked that her return date be moved to January 3, 2012. The representative with whom she spoke assured her that her return date would be January 3. But on December 20, 2011, a member of Jackson's Integrated Leave Management Office called to inform her that she had exhausted her available leave and would have to return to work by December 22, 2011. Dixon did not return on that date, and the Public Health Trust terminated her employment in a letter dated December 22. The letter noted that Dixon had failed to return to work on December 19 (not December 22, as she had been told on the phone). Then, based on Jackson's "Policy & Procedure Manual Code No. 310," the letter deemed Dixon to have resigned by failing to appear at work for three straight days.[4] Dixon found the

---

[3] The Public Health Trust had hired a private company to serve as its agent for purposes of monitoring and administering leave time for employees working at Jackson.

[4] The pertinent part of Dixon's termination letter states:

3

letter waiting in her mailbox when she returned home on December 30, 2011.  But she did not contact Jackson or the Public Health Trust about her termination until her attorney sent a letter to Jackson on March 14, 2012, asserting that she had been fired in violation of the FMLA and the CBA.  No one from Jackson or the Public Health Trust responded to that letter.

Dixon filed suit in July 2012.  She brought four claims under the FMLA, alleging that the Public Health Trust had:  (1) terminated her employment before she completed her FMLA leave, (2) failed to restore her to her previous position after her leave ended, (3) denied her employment benefits by failing to restore her to her previous position, and (4) interfered with her FMLA rights.  See 29 U.S.C. §§ 2612, 2614–2615.  She brought two claims under the CBA, alleging that the Public Health Trust had:  (1) denied her the leave of absence guaranteed under Article 29, and (2) fired her in violation of the "for cause" requirement in Article 12.

---

This action is taken in accordance with JHS Policy & Procedure Manual Code No. 310, which states that an employee who is absent from work, without approval, for a period of three (3) consecutively scheduled workdays may be considered to have resigned.  Specifically, you have not worked since September 21, 2011.  You were provided with a notice letter advising you of the unofficial leave of absence on December 15, 2011.  The letter further informed you that if you did not return to work by December 19, 2011 you would be deemed to have resigned your position pursuant to JHS Policy and Procedure Manuel Code No. 310.  You have the right to petition the Integrated Leave Management Office, within 14-days upon receipt of this letter, for a review of the facts regarding your resignation.

4

Shortly after Dixon filed suit, the Public Health Trust moved to dismiss her complaint for failure to state a claim. The district court dismissed all four FMLA claims with prejudice but dismissed the two CBA claims without prejudice. As for the FMLA claims, the court noted that the FMLA requires employers to give qualifying employees a minimum of twelve weeks of unpaid leave. See 29 U.S.C. § 2612(a)(1). Because Dixon's leave began on September 25, 2011, she had received all the leave she was entitled to under the FMLA by December 18, 2011. The court reasoned that the decision to terminate Dixon on December 22 did not violate the statute, and thus her complaint had not made out a claim for relief under the statute. It therefore dismissed all four FMLA claims with prejudice. On the other hand, Dixon's CBA claims received a reprieve of sorts. The court concluded that Dixon's complaint failed to allege that she had followed the grievance and arbitration procedures mandated by the CBA, but that her complaint might be amended to cure that defect. The court dismissed the two CBA claims without prejudice, giving Dixon two weeks to file an amended complaint.

Dixon filed a timely amended complaint. Her new complaint included allegations that she followed the CBA's procedures and also added a new claim for breach of contract. That new claim asserted that the promise to grant Dixon leave into 2012 was a contract separate from the CBA, and that the Public Health Trust had breached that contract. At the close of discovery, the Public Health Trust

5

moved for summary judgment on her remaining claims.  The district court granted the motion, concluding that Dixon had not filed a timely grievance as required by Article 6 of the CBA or submitted her claims for arbitration as required by Article 7.[5]

## II.

Dixon contends that the district court erred in dismissing her FMLA claims under Federal Rule of Civil Procedure 12(b)(6).  We review that decision de novo, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff."  Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1215 (11th Cir. 2012) (quotation marks omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (quotation marks omitted).

All four of Dixon's FMLA claims were premised on the notion that she was terminated before she had received the leave she was entitled to under the FMLA.[6]

---

[5] The district court did not expressly address the breach of contract claim that Dixon added when amending her complaint.  Dixon does not challenge the district court's decision based on that oversight, or even expressly raise her breach of contract claim as a reason why her suit should have survived the summary judgment motion, so we need not address it in detail here. See Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1293 (11th Cir. 2009) (holding that parties abandon arguments by failing to brief them properly).  In any event, as we explain in Section III, that breach of contract claim falls under the CBA's grievance and arbitration procedures. See infra note 8 and accompanying text.

[6] Dixon did not bring a retaliation claim in either her original or amended complaints. See 29 U.S.C. § 2615(a)(2).

The FMLA provides that, in qualifying circumstances, "an eligible employee shall be entitled to a total of 12 workweeks of leave." 29 U.S.C. § 2612(a)(1) (emphasis added). The statute also grants employers the right to require employees "to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for leave provided under [the FMLA]." Id. § 2612(d)(2)(B). So if Dixon was terminated after she received twelve weeks of leave — be it paid or unpaid, personal or family, vacation or medical — none of her four FMLA claims are viable. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 96, 122 S.Ct. 1155, 1165 (2002); McGregor v. Autozone, Inc., 180 F.3d 1305, 1308 (11th Cir. 1999) ("The statute provides for only 12 weeks of leave."). According to the exhibits attached to Dixon's complaint, her leave began no later than September 25, 2011. See supra note 2. So by December 18, 2011, she had received the twelve workweeks of leave guaranteed by the FMLA. She was fired three days later, which means none of her FMLA claims are viable. The district court therefore properly dismissed all four of them.

Dixon contends that the district court failed to account for the Public Health Trust's promise "to combine private and FMLA leave so that the leave would be valid into the year 2012." Apparently, Dixon believes that the FMLA grants employees a 12-week block of "FMLA leave time" that is distinct from any leave time their employer gives them. We have explicitly rejected such an understanding

7

of the FMLA.  See McGregor, 180 F.3d at 1306, 1308 (rejecting a plaintiff's contention that "she was entitled to 13 weeks of employer-provided paid disability leave and then 12 weeks of unpaid FMLA").  The Public Health Trust had the statutory right to count Dixon's leave against her twelve-week FMLA guarantee and was not obligated to notify her in advance that it would exercise that right.  See id. at 1308; Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1205 (11th Cir. 2001).  How the Public Health Trust initially characterized Dixon's leave is irrelevant.

The FMLA guaranteed Dixon a total of twelve weeks of leave and no more.  Because her complaint alleged that she received that much, it failed to state a claim for relief under the FMLA.[7]

---

[7] Dixon makes two other challenges to the district court's decision dismissing her FMLA claims.  First, she contends that the district court erred by considering evidence beyond the pleadings when deciding the motion to dismiss.  Specifically, she asserts that the district court mistakenly considered documents that the Public Health Trust attached to its reply brief.  Nothing in the district court's opinion supports that assertion.  The court explicitly based its decision on "[t]he complaint and attached letters."  It was free to consider both when resolving the motion to dismiss.  See Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal . . . .").

Second, Dixon contends that the district court should have granted her leave to amend her complaint instead of dismissing her FMLA claims with prejudice.  But she offers no explanation as to how she could have amended her complaint to make her FMLA claims viable.  The district court did not err in refusing her leave to amend because any amendment would have been futile.  See Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc., 556 F.3d 1232, 1241 (11th Cir. 2009) (explaining that a district court may deny a motion for leave to amend based on the "futility of amendment") (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962)).

III.

Dixon also contends that the district court erred by granting the Public Health Trust's motion for summary judgment on her three non-FMLA claims. Count Two alleged that it denied Dixon the leave she was guaranteed under Article 29 of the CBA. Count Three alleged that it fired her in violation of the "for cause" requirement in Article 12 of the CBA. And Count Seven alleged that Dixon's promised leave was a separate contract that the Public Health Trust breached by firing her before she received all of the promised leave. "We review de novo a district court's grant of summary judgment, applying the same legal standards as the district court." Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000).

As a general rule, plaintiffs "claiming breach of a collective bargaining agreement or wrongful termination of employment by their employer are bound by that agreement's terms providing a method for resolving disputes between them and their employer." Mason v. Cont'l Grp., Inc., 763 F.2d 1219, 1222 (11th Cir. 1985). If the CBA required Dixon to exhaust her administrative remedies under it and she did not, then summary judgment was appropriate. See Thomas v. Kroger Co., 24 F.3d 147, 149–50 (11th Cir. 1994); Sams v. United Food & Commercial Workers Union, 835 F.2d 848, 850 (11th Cir. 1988).

We begin by reviewing the terms of the CBA that define when and how Dixon must seek relief through the CBA's administrative remedies. In doing so,

9

we apply a "presumption of arbitrability." Parker v. Connors Steel Co., 855 F.2d 1510, 1522 (11th Cir. 1988) (quotation marks omitted). That presumption means "doubts concerning the arbitrability of disputes should be resolved in favor of arbitration." Aluminum Brick & Glass Workers Int'l Union v. AAA Plumbing Pottery Corp., 991 F.2d 1545, 1549 (11th Cir. 1993). The presumption also applies to the internal grievance procedures that often precede formal arbitration in a CBA's scheme of administrative remedies. See Mason, 763 F.2d at 1222. The CBA's grievance and arbitration provisions must "be broadly construed to encompass all claims that the employees have been terminated wrongfully and deprived of benefits guaranteed by the agreement unless the subject of the dispute is clearly excluded from the grievance procedure." Id.

Articles 6 and 7 of the CBA set forth a mandatory grievance and arbitration procedure. Article 6 lays out a three-step process for resolving any "grievance" between the employer and the union or its employees. Those three steps, in brief, are: (1) discuss the "grievable decision" with the employee's immediate supervisor or the manager who made the decision; (2) file a written grievance with the Director of Nursing/Administrator, a designee, or the person with the authority to correct the contractual violation; and (3) file a written grievance with the Director of Employee/Labor Relations and Workforce Compliance Department or the Director's designee. Section 2 of Article 6 provides that "[a]ny grievance shall

10

be void" if the employee does not initiate the grievance procedure within ten workdays of the decision on which the grievance is based. Article 7 establishes an arbitration procedure in the event that the grievance procedure is unsuccessful.

The threshold question is whether Dixon's three claims fall under the definition of "grievance" in Article 6. Section 1 of Article 6 defines a "grievance" as any "dispute between the Employer and the Union and/or the employees concerning the interpretation or application of a specific provision of this Agreement." The key term in the definition is "concerning." That term means "[r]elating to" or "affecting." Black's Law Dictionary 289 (6th ed. 1990). So a claim is a "grievance" under the CBA if it is a disagreement that relates to or affects specific provisions of the CBA. All three of Dixon's claims meet that definition. Counts Two and Three directly invoke Articles 29 and 12 of the CBA respectively, so they necessarily "concern[] the interpretation or application of a specific provision of this Agreement." Count Seven, the breach of contract claim, also relates to a specific CBA provision because it alleges that Dixon was promised an unpaid leave from September 2011 to March 2012, and Article 29 defines the circumstances in which division directors and vice presidents are authorized to "grant a leave of absence" without pay. Resolving that claim requires determining

11

whether that leave was properly promised under Article 29.[8]  Thus, all three claims are "grievances" as defined by Section 1 of Article 6.

Dixon resists that conclusion, arguing that her claims were not "grievances" under Article 6 because her December 22 termination letter invoked Jackson's personnel policy instead of a CBA provision.  See supra note 2.  According to her argument, the CBA's three-step procedure does not apply unless the employer invokes a specific CBA provision when it fires an employee.  That argument misunderstands Article 6's definition of "grievance," which focuses on the "dispute" — the disagreement between the employee and the employer — not on the action by the employer that led to the disagreement.  It is not the initial action but the resulting disagreement that must "concern[] the interpretation or application of a specific provision of th[e] Agreement."  And as we just explained, all three of Dixon's non-FMLA claims concern specific provisions of the CBA.

Because all three of Dixon's claims are "grievances," those claims are void under Section 2 of Article 6 because she did not follow Article 6's three-step grievance procedure.  Dixon learned of her termination no later than December 30, 2011, when she returned home to Florida.  Yet she did not take any action that

---

[8] Furthermore, we have previously held that, under the Labor Management Relations Act, a plaintiff "cannot claim both a separate, individual employment agreement and an agreement tied to the collective bargaining agreement." Redmond v. Dresser Indus., Inc., 734 F.2d 633, 635 (11th Cir. 1984).  Like the plaintiff in Redmond, Dixon cannot rely on an alleged side agreement with her employer when its subject matter is covered by the CBA.

could even be construed as a step in the grievance procedure until March 14, 2012, when her attorney sent a letter to the Public Health Trust.  Under Section 2 of Article 6, Dixon's failure to initiate the three-step grievance procedure within the ten workday window renders her claims void.  Summary judgment was appropriate.  See Thomas, 24 F.3d at 149–50.

Dixon makes two other unpersuasive arguments as to why she did not have to follow the CBA's three-step grievance and arbitration procedure.  First, she claims that she had a reasonable belief that the CBA did not apply to her.  She explains that, based on her reading of her termination letters and her belief that her failure to pay her union dues meant she was no longer a member, she thought "she no longer had any rights or remedies pursuant to any Jackson policy."  There is no legal support for the proposition that an employee's belief that a CBA does not apply excuses that employee from following the CBA's administrative procedures.[9]  Quite the opposite:  The well-established principle is that grievance

---

[9] Dixon supports her argument by citing our decision in Watts v. Bellsouth Telecommunications, Inc., 316 F.3d 1203 (11th Cir. 2003).  But Watts has no application here. In that case we held that the administrative exhaustion requirement for ERISA claimants does not apply where "the claimant's failure to exhaust her administrative remedies is the result of language in the summary plan description that she reasonably interpreted as meaning that she could go straight to court with her claim."  Id. at 1204.  The ERISA exhaustion requirement "is a court-imposed, policy-based requirement."  Id.  And we created the "reasonable interpretation" exception because it would "promote the important purposes served by the doctrine [of exhaustion]."  Id. at 1209.  By contrast, Dixon asks us to carve out an exception to the general rule favoring grievance and arbitration procedures that Congress established through the Labor Management Relations Act, see Redmond, 734 F.2d at 635 (applying 29 U.S.C. § 185).  We are reluctant to create an exception to a statutory scheme.  Cf. United States v. Johnson, 529 U.S. 53, 58, 120 S.Ct. 1114, 1118 (2000) ("When Congress provides exceptions in a statute, it does not

13

and arbitration provisions should be read to apply to a claim "unless the subject of the dispute is clearly excluded from the grievance procedure."  Mason, 763 F.2d at 1222.  Reading an implicit "reasonable belief" exception into the CBA would eviscerate that principle.

Second, Dixon asserts that she did not have to exhaust her administrative remedies because Florida law allows her to choose between pursuing administrative remedies and suing in court for breach of contract.  To support her position, she cites our predecessor court's decision in Ferguson v. Seaboard Air Line Railroad Co., 400 F.2d 473 (5th Cir. 1968).[10]  But Ferguson was a Railway Labor Act case that turned on the specific administrative remedy provision in that Act at that time.  See id. at 474–75.  Dixon's claims fall under the Labor Management Relations Act, where the general rule requires plaintiffs to follow the grievance procedures established by their CBA.  See Mason, 763 F.2d at 1222; Redmond v. Dresser Indus., Inc., 734 F.2d 633, 635 (11th Cir. 1984).  So Ferguson has no application here.

**AFFIRMED.**

---

follow that courts have authority to create others.").  Furthermore, as we explain, the exception Dixon seeks undermines Congress' policy goal.

[10] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

14